MIDWOOD INDUSTRIES, INC.

v.

UNITED STATES.

C.D. 4026;  Protest Nos. 68/44059–
26779–68, etc.

United States Customs Court,
Third Division.

May 27, 1970.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz and James S. O'Kelly, New York City, of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Steven R. Sosnov, New York City, Trial Atty.), for defendant.

Before RICHARDSON, LANDIS, and ROSENSTEIN, Judges.

RICHARDSON, Judge:

The merchandise of these protests, consolidated for trial, consists of steel forgings exported from West Germany, England, and Italy, and entered at the port of New York. Delivery of the merchandise to the plaintiff-importer was refused by the regional commissioner of customs upon entry in accordance with provisions of 19 U.S.C.A., section 1304 (a) relating to markings as to country of origin on the merchandise. Plaintiff protests against the action of the regional commissioner of customs herein, contending:

> We contend that said merchandise is clearly and properly marked with the country of origin, in full compliance with Section 304, Tariff Act of 1930 as amended, and should not have been excluded from delivery.

Also, in a brief filed after trial and submission of the case plaintiff claims additionally that marking the country of origin on the imported merchandise was not required perforce of clause (H) of subdivision (3) of subsection (a) of section 304 of the Tariff Act of 1930, as amended (19 U.S.C.A., section 1304(a) (3) (H)).

Section 1304(a) and section 1304(a) (3) (H) read as follows:

> (a) Except as hereinafter provided, every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article. The Secretary of the Treasury may by regulations—
>
> \*   \*   \*   \*   \*   \*
>
> (3) Authorize the exception of any article from the requirements of marking if—
>
> \*   \*   \*   \*   \*   \*
>
> (H) An ultimate purchaser, by reason of the character of such article or by reason of the circumstances of its importation, must necessarily know the country of origin of such article even though it is not marked to indicate its origin \*  \*  \*.

And section 11.10 of the Customs Regulations (19 C.F.R. 11.10) reads in relevant part as follows:

> (a) Articles within any specification in Section 304(a) (3), Tariff Act of 1930, as amended, are hereby excepted from the requirement of marking. \*  \*  \*

At the trial the official papers, among other things, were placed in evidence at the instance of the plaintiff. In the handling of each entry in customs it appears that admonition was given by one customs officer to another to the effect that if the forgings were not marked with the country of origin or were marked with the country of origin only on the extreme ends of the article imported that a "not legally marked" notice was to be issued immediately and a sample of the merchandise forwarded to the appropriate customs office. This was apparently done pursuant to the directive of the Commissioner of Customs as set forth in T.D. 68–57, dated Feb-

ruary 13, 1968, the text of which reads in part as follows:

The Bureau of Customs has recently reviewed the application of the country of origin marking requirements of section 304, Tariff Act of 1930, as amended (19 U.S.C. 1304), to imported unfinished welding fittings and flanges which are processed into finished fittings and flanges in the United States.

The processes involved in finishing the imported articles include such processes as cleaning to remove mill scale and rust; trimming excess material from the ends of fittings and beveling and machining the ends of the fittings; machining the faces and machining or threading the bore, and drilling bolt holes in the flanges; marking the articles with the name or trademark of the processor; and painting them.

The Bureau has concluded that the processor of such unfinished welding fittings and flanges is not the ultimate purchaser of the articles within the meaning of section 304, since the further processing does not result in the manufacture of a new and different article with a new name, character, or use within the meaning of the principle of the decision in the case of United States v. Gibson-Thomsen Co., Inc. (1940), 27 CCPA 267, C.A.D. 98.

Accordingly, unfinished welding fittings and flanges shall be required to be legibly and conspicuously marked to indicate the country of origin by die stamping or other permanent marking in a location on the articles where the marking will not be obliterated by the processing which is performed to make them into finished articles. Flanges shall be marked elsewhere than on the face or edges and pipe fittings shall be marked elsewhere than on the extreme ends. Fittings which are to be cut apart in processing, such as fittings in the shape of 180-degree returns, shall be marked in such a way as to insure that the marking will appear on each resulting part after the processing is completed.

In the instant case the action taken by the regional commissioner under the marking statute does not appear to have been uniform in connection with all of the entries before the court. In three of the protests at bar it appears either from customs form 4647 as in entry 1132653 of protest 68/44060, or from notations entered on the Summary of Examination and Appraisement sheet as in entry 1111075 of protest 68/49196 and in entry 1124332 of protest 68/47006, that the action taken by the regional commissioner under the marking statute concerned the legality of the markings on the imported forgings. But in entry 1136406 of protest 68/44061, covering five crates of forgings from West Germany, the marking notice given on customs form 4647 under date of June 24, 1968, reads:

#3 case shows no country of origin on steel forgings.

And in entry 1099169 of protest 68/44059, covering four casks of forgings from West Germany, the marking notice given on customs form 4647 under date of June 19, 1968, reads:

Outside container marked with c/o on tag. Forgings, illegible markings or none at all.

Notwithstanding this diversity of action on the part of the regional commissioner as noted herein, the propriety of the commissioner's actions with respect to (1) legality of markings, (2) legibility of markings, and (3) non-existence of markings comes within the purview of the protest claim, and as such, is reviewable by this court. However, we are of opinion that the claim for exemption from marking, belatedly advanced in the brief filed by plaintiff, is not before this court. The protest filed by plaintiff herein does not apprise the regional commissioner of any claim of exemption from marking requirements so as to afford the commissioner an opportunity to review his action and the evidence of record in the light of such claim. Consequently, the claim of exemption from marking cannot be pressed in this court. Geo. S. Bush & Co., Inc. v. United States, 19

Cust.Ct. 37, 42, C.D. 1064 (1947). Accord: Dr. Gemma Barzilai v. United States, 4 Cust.Ct. 25, 26, C.D. 275 (1940); reh. den. 4 Cust.Ct. 419, Abs. 43362 (1940).

Broadly speaking, the evidence in this case deals with what plaintiff does with the forgings at bar after importation, and also what the industry generally does with them. But no specific evidence has been adduced here by plaintiff, and we do not find any of record, to refute the section 1304(a) findings made by the regional commissioner under the entry in protest 68/44061 (i. e., the finding that the forgings in case #3 were not marked with the country of origin) and under the entry in protest 68/44059 (i. e., the finding that the forgings were either illegibly marked or were not marked at all). In view of such failure of proof the presumption of correctness attaching to the commissioner's findings under these entries has not been rebutted. And it follows from this default that protests 68/44061 and 68/44059 must, therefore, be summarily overruled.

With respect to protests 68/44060, 68/49196, and 68/47006, the issue to be resolved by the court is whether the markings of the country of origin on the forgings covered thereby are in accordance with the requirements of section 1304(a), the issue turning, in our opinion, on whether plaintiff is an "ultimate purchaser" of the imported merchandise within the meaning of that statute. The forgings covered by these protests consist of forgings for flanges from Italy covered by entry 1132653 of protest 68/44060, forgings for 90 degree and 180 degree returns and for tees from West Germany covered by entry 1111075 of protest 68/49196, and forgings for reducers from England covered by entry 1124332 of protest 68/47006. The merchandise of these protests is represented in the instant record either by samples received in evidence as plaintiff's exhibits 5, 10, 11, 12 and 13, or by photo-

graphs received in evidence as plaintiff's exhibits 5A, 10A, 11A, 13A and 14. Exhibits 5 and 5A depict forgings for flanges such as are contained in the entry of protest 68/44060. Exhibits 11, 11A, 12, 13 and 13A depict forgings for returns and tees such as are contained in the entry of protest 68/49196. And exhibits 10, 10A and 14 depict forgings for reducers (concentric and eccentric) such as are contained in the entry of protest 68/47006. These items, after importation, are converted by plaintiff's manufacturing division, Tube Line Manufacturing Company, into welding flanges and fittings which are then sold by plaintiff under the name "Tube Line" to oil companies, petroleum companies, chemical plants, construction companies, and utilities and other industries for use in high pressure piping systems in connecting and joining sections of pipe.

At the trial plaintiff gave evidence of the various processes to which the imported forgings are subjected in its Tube Line plant in turning them into flanges and fittings conforming to standards reflected in specifications established for the industry by the American Standards Association (ASA).* And defendant gave evidence of how forgings of the kind imported by plaintiff are converted into commercially usable welding flanges and fittings in other plants located in the United States. Viewing the record as a whole, there does not appear to be much, if any, difference between the parties herein over what has to be done in order to convert forgings of the kind here involved into welding flanges and fittings, The difference between them, to which most of the evidence of record is directed, is over the techniques to be employed in the conversion process. But it is established in the record, and apparently not disputed by defendant's witnesses, that in the case of converting the imported flange forgings, excess material is removed from the rim, the forging is then faced, bored, threaded or bevelled, and drilled and spotfaced (R. 96–99, 112–113,

---

* Materials in the imported forgings are said to conform to standards established by the American Society for Testing Materials (ASTM).

116–117, 185–187); in the case of converting the imported forgings for fittings such as the returns (elbows) and tees, the edges are cut off and the ends are bored, tapered and bevelled, die lines and other surface imperfections removed, and the fitting is cleaned for the removal of oxidation and mill scale from the outer surface (R. 100–101, 118–119, 187–188). In the case of converting the imported forgings for reducers, the forging is heated and one end is reduced in size and diameter by compression, and with eccentric reducer forgings excess steel is removed, and the ends are aligned, trimmed and bevelled for welding purposes (R. 104–105, 190–191); and that in accordance with ASA specifications the flanges and fittings are marked with the manufacturer's trade name or trademark, grade of steel, and wall thickness or pressure rating and size (R. 105–106, 191).

In plaintiff's operations at the Tube Line plant the forgings for fittings are also subjected to shot peening. The same is true in a plant from which one of defendant's witnesses came. But two other witnesses called by defendant took the position that shot peening was not a necessary or proper step in the conversion process. And in plaintiff's operations the flanges and fittings are subjected to chemical baths which clean and coat them with a phosphate solution. They are then given a final heat treatment and a rustproof coating. But in plants from which some of the witnesses called by defendant come the finishing operations involve painting, and in some cases, operations which are said to be strictly cosmetic and esthetic for the benefit of the customer.

On the matter of usage of the imported forgings *per se*, David A. Wingate, plaintiff's president, testified (R. 122–123):

Q. Can the articles which you import, of the kind described on the invoices in this case, be used for any purpose in their imported condition, that you know of?—A. No.

Q. Why not?—A. Because the purpose of this product, of the fittings, is actually to connect pipes of a matching size. These rough forgings has [sic] no connecting ends, they are rough; they do not measure exactly the same way that the matching pipe would match; you cannot weld them together, you cannot connect them together, and obviously there's no purpose for them, they're just a piece—an object of metal, but without any purpose.

On the same subject Joseph Choplin, executive vice president in charge of sales for Henry P. Pancoast Company of Philadelphia, Pa., a distributor of "Tube Line" products, among other things, testified (R. 313):

Q. And do you remember the articles that he [David A. Wingate] referred to as forgings, or rough forgings?—A. Yes, sir.

Q. Referring to the exhibits in this case, which he described as forgings, or rough forgings: In your opinion, do they have any commercial use?—A. Not at our level.

Q. What do you mean by that?—A. At our level they must be a finished product, or a manufactured product, for use to distribute them; they must meet the ASA, and ASTM specifications—and the forging end of it does not.

Q. Then, do you know of any commercial use for the items that have been identified in this case as samples of the imported articles?—A. No, sir.

Q. Can you tell us why they cannot be used?—A. They don't meet any specifications, that I know of.

Q. In their imported condition?—A. In their imported condition—at our level, that is.

The foregoing testimony, given on plaintiff's behalf, was corroborated in the testimony of Frank S. G. Williams, vice president without portfolio on the president's staff of Taylor Forge, Inc. of Chicago, Ill., a manufacurer of forgings, who in describing the purpose for processing performed on exhibit 1, testified (R. 271): "all you are doing is to * * *

machine it to be usable * * *." And again on the subject of use of the imported articles, Thomas H. Pike, Jr., vice president in charge of marketing and planning for Tube Turns Division of Chemetron Corporation of Louisville, Ky., a manufacturer of commercial forgings, and welding fittings and flanges, testified on behalf of defendant (R. 347):

> Q. To what commercial use can articles such as Exhibits 1 through 14 be put?—A. They can be sold to a machine shop, or an equipment manufacturer who does his own drilling, cuts his own angles, for installation in his own equipment.
>
> We do make such sales. I will admit they do not constitute the bulk of the sales, but we sell flanges, unfinished flanges, of some of the types that are there, to valve manufacturers; and they put their own facing on it. * * *

With respect to nomenclature, the imported articles were variously described by the witnesses. The witness Wingate and the witness Joseph Lawrence Varga, manager of Tubular Products Division of Babcock & Wilcox Company at Copper, Pa., referred to exhibits 1 through 14 as "forgings." The witness Pike referred to some of the forgings as unfinished flange forgings and "unfinished 180 degree elbow." And the witness Williams referred to some of them as a "flange in the rough," or as "semi-finished" articles.

It is apparent from the evidence at bar that the processes to which the imported merchandise is subjected after entry are essentially the same as those the subject of the Bureau of Customs' ruling in T.D. 68–57 hereinbefore noted, and that these processes will result in the obliteration or destruction of the markings of country of origin on the imported articles at the time of entry. The Bureau's position in rejecting the legal sufficiency of such markings is that the further processing does not result in the manufacture of a new and different article with a new name, character, or use as enunciated by our appeals court in United States v.

Gibson-Thomsen Co., Inc., 27 CCPA 267, C.A.D. 98 (1940).

In the *Gibson-Thomsen Co.* case, the imported merchandise was toothbrush handles and brush blocks with the country of origin marking being in such a position that when bristles were inserted therein in the manufacture of toothbrushes and hairbrushes in this country the marking would be obscured. The collector refused to permit delivery of the handles and blocks to the importer until they were marked with the country of origin in a conspicuous place which would survive the manufacturing process, the collector declining to treat the importer as the ultimate purchaser of the imported articles. The courts sustained the importer's protest against the action taken by the collector under the marking statute. Our appeals court stated in that case, among oher things, (page 273):

> It is clear from the record that the involved articles * * * are so processed in the United States that each loses its identity in a tariff sense and becomes an integral part of a new article having a new name, character, and use. We are of opinion, therefore, that, at the time of their importation, the involved articles were marked "in such manner as to indicate to" the "ultimate purchaser in the United States"—the country of their origin— Japan.

We do not deem it necessary to determine whether or not the processes employed at plaintiff's Tube Line plant in the conversion of the imported articles into flanges and fittings are generally prevalent throughout any segment of the industry in the United States. We think that the tools, machinery, and techniques to be employed in this work by the plaintiff or by any other firm doing this kind of work is a matter to be determined solely by the firm undertaking the conversion operation on the imported articles or articles like them, in line with the dictates of business requirements. And in this connection, what may be practical for one firm in terms of its volume of

business may be impractical for another. Accord: United States v. Anderson, 2 Ct.Cust.Appls. 350, 352, T.D. 32080 (1911). In any case, we are of the opinion that the processes to which the imported articles are subjected in plaintiff's Tube Line plant, namely, the cutting, boring, facing, spotfacing, drilling, tapering, threading, bevelling, and heating and compressing, are manufacturing processes, irrespective of how performed, and albeit that these processes are representative of a successive stage of manufacture. Tide Water Oil Company v. United States, 171 U.S. 210, 18 S.Ct. 837, 43 L.Ed. 139.

 We are also of the opinion that the end result of the manufacturing processes to which the imported articles are subjected in plaintiff's Tube Line plant is the transformation of such imported articles into different articles having a new name, character and use. The evidence clearly shows that the imported articles, referred to by most of the witnesses and by the invoices as well as "forgings" of one kind or another, are *producers'* goods which are not in fact used by the consumer in such state of manufacture and are not capable of use by the consumer in that state. While it may be true, as some of the testimony of record indicates, that the imported forgings are made as close to the dimensions of ultimate finished form as is possible, they, nevertheless, remain forgings unless and until converted by some manufacturer into *consumers'* goods, i. e., flanges and fittings. And as *producers'* goods the forgings are a material of further manufacture, having, as such, a special value and appeal only for manufacturers of flanges and fittings. But, as *consumers'* goods and flanges and fittings produced from these forgings are end use products, having, as such, a special value and appeal for industrial users and for distributors of industrial products. Consequently, the two classes of goods, namely, the imported forgings, and the fittings and flanges made therefrom, the different articles of commerce in a tariff sense. United States v. In-

ternational Paint Co., Inc., 35 CCPA 87, 94, C.A.D. 376 (1948). It therefore follows that the *ultimate purchaser* of the forgings at bar is not the retail or wholesale purchaser of the flanges and fittings made therefrom but is the manufacturer of the flanges and fittings—in this case the plaintiff. United States v. Gibson-Thomsen Co., Inc., *supra*. And since the forgings covered by protests 68/44060, 68/49196, and 68/47006 were marked with the country of origin as to the plaintiff at the time of entry this is sufficient compliance with the requirements of section 1304(a). In fact, a marking of country of origin for the benefit of a purchaser of flanges and fittings would serve no useful purpose according to the evidence of record which indicates that ASA specifications require marking of a different nature thereon.

For the reasons stated protests 68/44060, 68/49196, and 68/47006 are sustained, and protests 68/44061 and 68/44059 are overruled.

Judgment will be entered accordingly.