**TEXAS INSTRUMENTS INCORPORATED,**
Appellant,

v.

**The UNITED STATES, Appellee.**

Appeal No. 81–31.

United States Court of Customs and Patent Appeals.

June 3, 1982.

Frederick L. Ikenson, Washington, D. C., for appellant.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Director, Joseph I. Liebman, Attorney-in-charge, and Saul Davis, New York City, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

RICH, Judge.

This appeal is from the decision of the United States Court of International Trade (court below) granting the Government's motion for summary judgment and denying Texas Instrument's (TI) cross-motion for summary judgment, holding that TI's importation was not entitled to duty-free entry pursuant to the Generalized System of Preferences (GSP), 19 U.S.C. 2461 *et seq.*, 520 F.Supp. 1216, 2 CIT ——, (1981). We reverse.

### Background

The imported goods are electronic camera parts, called "cue modules," and consist of a flexible circuit board having attached thereto three integrated circuits (IC's), one photodiode, one capacitor, one resistor, and a jumper wire (which is merely extra lead length cut from the resistor). Below is a diagram of one complete cue module. It is to be understood that the conductors in the flexible circuit board interconnect the components and that the module is intended to be incorporated in a camera.

The cue modules were classified as "other" parts of photographic cameras under Tariff Schedules of the United States (TSUS), item 722.34, as modified by T.D. 68–9, and assessed with a 10% ad valorem duty. Appellant agreed that the goods were properly classified, but argued that

they should have received duty-free treatment under the GSP in accordance with TSUS General Headnote 3(c).[1]

The pertinent facts were described by the court below as follows:

> Certain items were imported into Taiwan where they were then assembled into the ICs and photodiodes. These items consisted of silicon slices containing a multitude of fabricated electronic chips, lead frame strips, mold compound, gold wire on spools and chip mounting material, either epoxy or gold preforms. The chips were separated by a "scribe and break" operation. Subsequently, each chip was mounted (and by use of epoxy or gold preform made to adhere conductively) to a section of a lead frame strip. Pieces of gold wire were used to provide an electrical connection from various areas on the chip to various areas on each lead frame strip section. Plastic mold compound was then liquified and molded under pressure over each section of lead frame strip containing a bonded and connected chip (or, in one instance, two bonded and connected chips). After the mold compound hardened into a protective covering, the lead frame strips were trimmed and severed into a multitude of individual devices. The devices, at this stage, were finished ICs and photodiodes.

Additionally, we note that the principal parts of the cue module, and materials such as gold wire, epoxy, and molding compounds, including those utilized in Taiwan to construct the IC's and photodiodes, were imported into Taiwan from the United States.

The court below, granting the Government's motion for summary judgment, held that the "value of the IC's and photodiodes cannot be included in the figures for the 'cost of material' and 'direct costs of processing' to determine whether these figures are not less than 35 percent of the appraised value of the cue modules." The court opined that the "use of the term 'article' to refer to imported merchandise, and use of the term 'material' to refer to the value added [sic] requirement for the 'eligible article' in the BDC [beneficiary developing country], clearly demonstrate the Congressional intent to differentiate between 'articles' on the one hand and 'materials' on the other hand."

Referencing 19 CFR 10.177(a),[2] which limits inclusion in the 35 percent of appraised value (not "value added") figure to, among other things, "material" which was either wholly the growth, product, or manufacture of the BDC or substantially transformed in the BDC into a new and different article of commerce, the court stated that, "while the assembly of fabricated components, rather than materials, may be relevant in determining whether the 'eligible article' was a product of the BDC, assembly of fabricated components is not relevant respecting the 35 percent value added [sic] requirement." The court concluded that, "the GSP statute and pertinent regulations preclude the inclusion of fabricated compo-

---

1. General Headnote 3(c)(ii), 19 U.S.C. § 1202, reads, in relevant part:

Whenever an eligible article is imported into the customs territory of the United States directly from a country or territory listed in subdivision (c)(i) of this headnote, it shall receive duty-free treatment, unless excluded from such treatment by subdivision (c)(iii) of this headnote, provided that, in accordance with regulations promulgated by the Secretary of the Treasury:

(A) The sum of (1) the cost or value of the materials produced in the beneficiary developing country, plus (2) the direct costs of processing operations performed in such country is not less than 35 percent of the appraised value of such article at the time of its entry into the customs territory of the United States; * * *.

See 19 U.S.C. § 2463(b)(2).

2. 19 CFR 10.177(a) reads:

(a) *"Produced in the beneficiary developing country" defined.* For purposes of §§ 10.171 through 10.178, the words produced in the beneficiary developing "country" refer to the constituent materials of which the eligible article is composed which are either:

(1) Wholly the growth, product, or manufacture of the beneficiary developing country; or

(2) Substantially transformed in the beneficiary developing country into a new and different article of commerce.

nents produced outside the BDC and assembled in the BDC in the 'cost or value of the materials produced in the beneficiary developing country' to determine the 35 percent value added [sic] requirement. Consequently, *the value of the ICs and photodiodes cannot be included in the figures for the 'cost of materials' and 'direct costs of processing'* to determine whether these figures are not less than 35 percent of the appraised value of the cue modules." (Emphasis ours.)

### Issue

The issue, therefore, is whether the IC's and photodiodes found in the imported cue modules are "materials" which may be considered to have been "produced" in Taiwan. Was there such a "substantial transformation" of the parts and materials going to make up the IC's and photodiodes that "a new and different article of commerce" was produced?

There are no issues regarding the other requirements of the GSP. Taiwan is listed in General Headnote 3(c)(i) as a beneficiary developing country, the articles described by TSUS item 722.34 are GSP "eligible articles," and the cue modules were imported from Taiwan directly into the customs territory of the United States.

### OPINION

Initially, we note the conceptual difficulty which the facts of this case bring to the fore. 19 CFR 10.177(a) instructs that "constituent materials" of an "eligible article" may be considered produced in a BDC, even though imported thereinto, if they are there "substantially transformed * * * into a new and different article of commerce." One would likely believe that application of this rule normally arises upon the "substantial transformation" of *one* item, for example, the production of woven fabric components of shirts from imported raw fiber. In this case, however, we have several imported items—silicon slices containing unsevered IC chips, multiple lead frame strips, gold wire, molding compounds, etc.—some of which undergo some transformation before or in the course of being assembled by a number of machines to form the IC's and photodiodes and some of which, such as the gold preforms, are used as imported.[3] Thus, the narrow question before us is whether the making of the finished IC's and photodiodes can, as a matter of law, be considered under the GSP as the production of a "substantially transformed constituent material" from a "constituent material."

■ The court below never reached the issue of substantial transformation, holding that a mere assembly of fabricated components *cannot*, within the meaning of the GSP and as a matter of law, create a "material" to be utilized in the production of an "article." The court below relied on T.D. 76–100, 10 Cust.Bull. 176, 178, wherein it was stated that:

[When articles are] produced by the joining and fitting together of components [, they] are not considered substantially transformed constituent materials. Articles of this kind may well have been substantially transformed, but they are not produced from substantially transformed constituent materials. Under this criterion, partially completed components which are completed and assembled in the beneficiary developing country into finished articles or components do not qualify as substantially transformed constituent materials. By the same token, most assembly operations and operations incidental to assembly will not qualify. For example, various electronic components and a bare but otherwise finished circuit board are imported into a beneficiary developing country and there assembled by

---

**3.** The IC chips arrive in Taiwan in unsevered slice form, which slice must therefore be scribed and broken up, the lead frame strips, containing many connected frames, are eventually separated as parts of individual IC's and photodiodes, and the gold wire is snipped into pieces as it comes off a spool, etc., but the only items imported into Taiwan for use in the construction of the IC's and photodiodes which are completely "transformed" into something new are the molding compounds. The mold compounds, black for the IC's and transparent for the photodiodes, are utilized to encapsulate the IC chips.

soldering into an assembled circuit board for a computer. Although substantially transformed, the fabricated unit is not a substantially transformed constituent material of the computer, the exported eligible article produced in the beneficiary developing country.

We find nothing in the GSP statutes or related rules to support this limitation on what may be considered a "material," nor is it determinative that Congress chose to distinguish an "eligible article" from that which comprises it by utilizing the different terms "article" and "material." We, therefore, hold that the decision of the court below was in error, and we turn to the substantial transformation issue outlined above.

Appellant TI argues that the "definition of 'produced in' as including 'substantially transformed in' is entirely consistent with court decisions and administrative rulings and regulations which have been issued in numerous areas of the customs laws where a country of production must be ascertained." It is asserted that the substantial transformation test is used in determining whether merchandise is eligible for *drawback* under 19 U.S.C. § 1313, whether one has complied with the *country of origin marking* statute, 19 U.S.C. § 1304, whether an article or component claimed to be of United States origin is eligible for *special tariff treatment* under TSUS item 800.00 or 807.00, whether an article imported into the Virgin Islands claimed to be a product of the United States is eligible for duty-free treatment under 48 U.S.C. § 1395, and in determining whether an imported article may be classified as a "manufacture." Appellant states that, "In all of these instances, substantial transformation occurs when, as a result of manufacturing processes, a new and different article emerges, having a distinctive name, character, or use, which is different from that originally possessed by the article or material before being subjected to the manufacturing process." With respect to these differing areas of customs law involving substantial transformation, appellant cites a number of cases, some of which deal with transformation by assem-

bly and some of which deal with the transformation of one item. *Compare, e.g., Adolphe Schwob, Inc. v. United States*, 62 Treas.Dec. 248, T.D. 45908 (1932), *aff'd*, 21 CCPA 116, T.D. 46447 (1933) (watches assembled in the United States from imported parts held to have been manufactured in the United States) *with United States v. International Paint Co., Inc.*, 35 CCPA 87, C.A.D. 376 (1948) (imported paint substantially transformed by making it fit for use as a marine antifouling paint).

Appellant also cites Customs Service Decision 80–227, 14 Cust.Bull. No. 49 at 19–20 (1980), where the issue, in a "country of origin marking" case, was "whether assembly of integrated circuits, including attachment of the die and lead wires, encapsulation and testing, from imported semiconductor chips constitutes a substantial transformation." Noting that "semiconductor chips and other materials of no functional use in their imported state are to be assembled by a manufacturer in the United States," it was stated that

We are of the opinion that the procedures of attachment of the die and lead wires and encapsulation will result in a substantially transformed product. The use, character, name and value of a finished integrated circuit is substantially different from a semiconductor chip. Testing and marking only, however, are not considered to result in a substantial transformation.

In light of the recognition that "substantial transformation" is utilized in various aspects of customs law, appellant urges that "the concept of substantial transformation appears—not as some creative innovation, but as a familiar rule with a consistent and uniform meaning in customs law." Applying what it perceives to be the law, appellant concludes that a substantial transformation has occurred, for "all the materials imported into Taiwan become irreversibly altered and integrated into a new product, having a distinctive name, character, and use * * *."

The Government responds that appellant's construction of the GSP based upon judicial and administrative interpretation of other statutory origin requirements is irrelevant; they "do not possess bi-furcated [sic] origin requirements for the imported 'article' as a whole, on the one hand, and for the 'materials' that were utilized in the manufacture of the imported 'article,' on the other hand." The Government also argues that the chips, lead frames, gold wire, and gold preform that

> * * * became components of the imported cue modules in issue, through assembly into the packaged I.C.s and photodiodes which were then assembled into the cue modules in issue, were:
>
> > (a) fabricated components that were products of the United States;
> >
> > (b) did not lose their physical identity, after final assembly into the cue modules in issue, by form, shape or otherwise; and
> >
> > (c) were not improved in condition or advanced in value except by assembly and operations incidental to assembly.

The Government continues—

> The assembly operations performed in Taiwan merely allow the photodiode portion of the chip to function electronically through connections with other United States fabricated components which allow signals to be received into and emitted from the photodiode chip. There was no further fabrication of the photodiode chip itself in Taiwan. The assembly of the gold wire, lead frame, mold compound, and gold preform (or epoxy) with the chip to form the packaged photodiode does not change the chip, lead frame, or gold wire; it merely allows the potential of the chip to be realized.

and

> * * * the I.C. chips contain all of the electronics of the completed packaged I.C. chip and the packaged I.C. which is assembled into the cue module. These components are the essence of the I.C. chip and the packaged I.C. which is assembled into the cue module. The operations performed in the United States cre-

ate the components of the I.C. chip known as the transistors, resistors, capacitors, diodes, and (for one type of chip in issue) the MOS structure. These components are not physically changed in any manner, shape, or form subsequent to the exportation of the I.C. chip in slice form from the United States.

The Government thus concludes that no substantial transformation occurred in Taiwan; "To paraphrase Gertrude Stein, an I.C. (a photodiode) is an I.C. (or photodiode), is an I.C. (or photodiode), is an I.C. (or photodiode) whether packaged or unpackaged." While criticizing appellant for having done the same thing, the Government turns to cases from other areas of customs jurisprudence which discuss substantial transformation, concluding that "there was no fundamental change that spanned classes of articles. * * * Once one separates the wheat from the chaff of appellant's factual presentation, it becomes clear that the packaging does not transform anything." We disagree.

■ The question presented to us by the "substantial transformation" issue, not addressed by the court below, is a mixed question of technology and customs law, mostly the latter. In essence, the defendant's position, adopted by the court below, is that the making of the IC's and photodiodes was mere assembly of prefabricated components. The following are our principal reasons for disagreeing with the Government's position, adopted by the court below.

■ (1) One element allegedly imported into Taiwan was IC "chips." Chips were not imported. Silicon slices were imported. These were not ready to be assembled into anything in Taiwan and were never assembled into anything. The slices—carrying many hundreds of IC or photodiode elements, to be sure, but in unfinished or unseparated and "unpackaged" form—had to be further manufactured before chips ready for *assembly* came into existence. This involved the steps of careful scribing and production of the chips from the integral slices. The Government arguments attempt to equate chips and finished (i.e.,

"packaged") IC's as though, for practical purposes, they are interchangeable. The record is to the contrary. The affidavit of Jack S. Kilby of June 9, 1980, shows that although the industry has sold both chips and finished IC's, sales of the former are "minute in comparison with sales of" the latter, that the industry clearly distinguishes the two articles, and that when chips are sold "someone must perform the packaging process in order to convert the chip into a useable device." The truth of these statements is supported by the record. A packaged IC must be regarded as a different article of commerce from a mere chip.

(2) Chips had to be mounted on "lead frames" which provide electrical leads to the many electrical elements or areas of the chips, but lead frames ready for mere assembly in the usual sense of the term were not imported into Taiwan. What was imported were punched or die-cut metal strips capable of later manufacture into lead frames, after the chips were mounted thereon and connected to the leads, by operations hereafter described. Thus, individual lead frames, of different types, were produced in Taiwan from the prefabricated strips. Strips for IC lead frames contained 10 potential lead frames; those for photodiodes contained 50.

(3) The wiring of the chips to connect their circuitry to their lead frame contacts was done after the chips were secured to platforms provided on the metal strips by epoxy adhesive or gold preforms (predominantly if not wholly the former). The gold wire used for this operation was imported in bulk, on spools. Each connection of a frame lead to a chip contact pad by a piece of wire, attached at each end, was as much a manufacturing operation as hand-wiring any other piece of electrical equipment from a bulk supply of wire, notwithstanding the wiring here was done by robot-type machinery. Wiring was a manufacturing operation involving a large number of steps (at least on the IC's) and not a mere joining of two or more parts within the usual meaning of the term "assembly."

(4) The encapsulation of the wired chips on the lead frame strip was a plastic molding operation done in a multicavity molding machine. No plastic part ready for "assembly" was used. It was not like enclosing a radio in a cabinet. The bulk molding compound, brought into Taiwan in "hockey puck" form, was put into the molding machine and melted. As a liquid, it was injected into the mold cavities to surround the chip or chips, taking on an entirely new form. The thermosetting resin became solid in the mold and the whole unit was thereafter heated to effect final cure of the resin.

(5) The lead strips, flat until after the IC or photodiode mounting, wiring, and molding operations, were further manufactured by subjecting them to "trim and shear" operations which removed excess borders, severed the strip into individual units, and bent the contacts at right angles to the plane of the original strip, thus producing the "packaged" IC or photodiode which only then was ready for attachment to the flexible circuit board.

In light of the aforesaid explanations of what was actually done to the materials imported into Taiwan, we have no doubt there was compliance with the provision of 19 CFR 10.177(a)(2), "material which had been substantially transformed in the beneficiary developing country into a new and different article of commerce." We therefore respectfully disagree with the conclusion of the court below that the IC's and the photodiodes, as completed ready for assembly into the imported articles, were components "produced outside the BDC." We hold they were, on the contrary, materials produced in the beneficiary developing country and entitled to be included in computing the 35% of the appraised value of the imported cue modules.

The Government also argues, however, that agreement with appellant's position would frustrate the purpose of the GSP, which is to promote—

* * * "diversification," "development," and "industrialization" of BDC's, and, on the other hand, to assure that the bene-

fits of GSP would accrue to BDC's rather than to developed countries. Clearly, the purpose was to promote manufacturing operations which convert materials into articles, as opposed to a further extension of labor intensive assembly operations which have already been promoted under the "807.00 program."

The Government continues, saying that "It is evident that the GSP program was intended to make developing countries self-sufficient rather than continue the chain of dependency that mere assembly operations may foster." It is concluded that, "while the utilization of the non-BDC cost of fabricated components, in determining whether the 35% value added [sic] requirement * * * was fulfilled, would generally benefit the BDC with possible expension [sic] of trade, it would * * * frustrate the *major purpose* of our GSP * * *."

Given our holding that the IC's and photodiodes were the result of extensive manufacturing operations in Taiwan which converted materials into articles, as distinguished from mere assembly, that there was "substantial transformation" into new and different articles of commerce, and granting that a statute must be so interpreted as to implement its legislative purpose, we conclude that our decision in the case is harmonious with the legislative purpose. The facts of record indicate that a number of employees were needed, and had to be technically trained in numerous skills to "convert materials into articles" in the manner we have described above, laying the groundwork for the acquisition of even higher skills and more self-sufficiency.

Accordingly, the Court of International Trade's order granting defendant's motion for summary judgment, denying plaintiff's motion for summary judgment, and dismissing the action is *reversed.*

NIES, Judge, dissenting-in-part.

With respect to the Government's motion for summary judgment, I would reverse solely on the ground that the court erred in holding that assembly operations may not, as a matter of law, substantially transform fabricated components into a new and different article of commerce. I would, however, affirm the denial of appellant's motion for summary judgment. Further proceedings are necessary to determine whether a constituent material has been produced in Taiwan. I do not agree that this court should hold for appellant as a matter of law. In particular, I do not assume, as a matter of law, that every article which is of a type sold in commerce is itself an article of commerce. Nor do I agree that by characterizing the processing done in Taiwan as "manufacturing" rather than "assembly" a new and different article is necessarily created. *See,* e.g., *Anheuser-Busch Brewing Association v. United States,* 207 U.S. 556, 28 S.Ct. 204, 52 L.Ed. 336 (1908).