DAVIS, Circuit Judge.
The Government appeals from a decision of the United States Court of International Trade (CIT, Carman, ,/.), holding that certain industrial sewing-machine needles imported from Portugal by appellee (Torring-ton) are entitled to enter the United States duty free under the Generalized System of Preferences (GSP). 596 F.Supp. 1083 (1984). Agreeing that the imported articles meet the prerequisite for duty-free entry under the GSP statute (and corresponding Customs regulations), we affirm.
I.

Background

The GSP statute, 19 U.S.C. §§ 2461-2465 (1982), enacted as title V of the Trade Act of 1974, Pub.L. No. 93-618, 88 Stat. 2066, represents the United States’ participation in a multinational effort to encourage industrialization in lesser developed countries through international trade.[1] The Act authorizes the President (subject to certain restrictions) to prepare a list of beneficiary developing countries (BDCs), and to designate products of those countries which are eligible for GSP treatment. 19 U.S.C. § 2462. A designated product imported from a listed country may enter the United States duty free. Id., § 2461. One problem with this general program is that it could be used to allow a noneligible country to conduct minimal finishing operations in a BDC, thereby reaping the benefits of the GSP at the expense of American manufacturers, but without the salutory effect of fostering industrialization in the designated country. Congress therefore provided that products from BDCs must meet certain minimum content requirements in order to qualify for duty-free treatment.[2] To this end, 19 U.S.C. § 2463 provides:
(b) The duty free treatment provided under section 2461 of this title with respect to any eligible article shall apply only—
(2) If the sum of (A) the cost or value of the materials produced in the beneficiary developing country ... plus (B) the direct cost of processing operations performed in such beneficiary developing country ... is not less than 35 percent of the appraised value of such article at the time of its entry in thfe customs territory of the United States.
Section 2463(b) also authorizes the Secretary of the Treasury to “prescribe such regulations as may be necessary to carry out this subsection.”
Under this latter authority, the Customs Service has promulgated regulations interpreting the operative phrase in § 2463(b)(2)(A), supra, “materials produced in the beneficiary developing country.” 19 C.F.R. § 10.177(a) (1984) states that
the words produced in the beneficiary developing “country” [sic, indicating § 2463(b)(2)(A), supra ] refer to constituent materials of which the eligible article is composed which are either:
(1) Wholly the growth, product or manufacture of the beneficiary developing country; or
(2) Substantially transformed in the beneficiary developing country into a new and different article of commerce.
Thus, if the value of the materials described in § 10.177(a)(1) and (2) plus the direct cost of processing operations performed in the BDC account for 35% of the appraised value of the merchandise, the merchandise is entitled to enter duty-free under 19 U.S.C. §§ 2461 and 2463.
The question in this case is whether industrial sewing-machine needles which Tor-rington imported met these minimum content reqüirements. In the trial court, the parties stipulated to an agreed statement *1566 of facts which formed the basis of the CIT’s decision. These facts establish the following:
The sewing machine needles at issue[3] were exported from Portugal to the United States by Torrington Portuguesa, a manufacturing subsidiary of Torrington. The needles are classifiable under item 672.20 of the Tariff Schedules of the United States (TSUS), "Sewing machines and parts thereof.” At the time of the exports, Portugal was designated as a BDC and articles classifiable under item 672.20 were eligible products.
Torrington Portuguesa produced the needles from wire manufactured in a non-BDC and brought into Portugal. On this ground the Customs Service denied duty-free treatment to the needles because they did not incorporate any “materials produced” in Portugal, and the direct cost of producing the needles does not-account for 35% of their appraised value. In Customs’ view the needles failed to meet the minimum content requirements of 19 U.S.C. § 2463(b). Torrington agrees that if Customs’ decision not to include the non-BDC wire in the calculation is correct, then the needles do not satisfy the 35% BDC content requirement. On the other hand, if the other requirements are met, then the 35% BDC content prerequisite is also satisfied.
The parties also stipulated to the process by which Torrington Portuguesa produced the needles from the non-BDC wire. Initially, the wire runs through a swaging machine, which straightens the wire, cuts it to a particular length, bevels one end of the wire segment and draws out the straightened wire to alter its length and circumference at various points. The result is known in the needle industry as a “swaged needle blank,” a “needle blank,” or merely a “swage.” In an exhibit before the trial court, the parties included a linear drawing of a swage. The first quarter of a swage has roughly the same circumference as the wire segment from which it was made; the second quarter narrows from that size down to roughly half that circumference; the other half then extends straight out from the second quarter. At this point, the swage is useful solely in the production of sewing-machine needles with a predetermined blade diameter, though the resulting needle may vary in other respects (e.g., eye placement, eye size, and needle length).
The next process in the production of needles is “striking.” Striking involves pressing an eye into the swage, forming a spot to provide clearance for the thread, and bending the swage at a particular point. At this stage, the articles are known as struck blanks. The struck blank enters a mill flash machine which removes excess material around the eye and forms a groove along the length of the needle which carries the thread while the needle is in use. The merchandise is then pointed (i.e., sharpened) and stamped with a logo or other information. Finally, the needles are hardened, tempered, straightened, buffed, polished, cleaned and plated. Upon completion, the needle has a sharp point at the narrow end, a long groove running down three-quarters of its body ending near the point, and an eye somewhere in the groove with an indentation in the groove near the eye.
The parties also jointly detailed Torring-ton’s history of trade in swages. In 1973-74, Torrington Portuguesa twice shipped large amounts of swages to Torrington to correct production imbalances between the two companies. Torrington Portuguesa realized no profit on the exchange, and the transfer was accounted for through appropriate entries in the two companies’ inventory and receivables accounts. These are the only transactions in swages in which Torrington (now the only U.S. manufacturer of these needles) has participated.
Based on these facts, the Court of International Trade held the needles to be entitled to duty-free entry under the GSP. As a preliminary matter, the court ruled that, under Customs’ regulations, the non-BDC *1567 wire must undergo two substantia] transformations when it is manufactured into a needle if the value of the wire is to be included in the 35% calculation, and that each of these transformations under 19 C.F.R. § 10.177(a)(2) must result in an “article of commerce.” The court stated:
It is not enough to transform substantially the non-BDC constituent materials into the final article, as the material utilized to produce the final article would remain non-BDC material. There must first be a substantial transformation of the non-BDC material into a new and different article of commerce which becomes “materials produced,” and these materials produced in the BDC must then be substantially transformed into a new and different article of commerce.
596 F.Supp. at 1086. The court noted that the Customs Service and Treasury Department have consistently interpreted the regulations to require a dual transformation (i.e., two successive substantial transformations) in order to be eligible for GSP treatment, and that the requirement of a dual transformation advances the GSP’s goals by requiring greater work in the BDC and by thwarting manipulation of the GSP (which the content requirements were designed to avoid).
The court then turned to the question of whether the production of needles in Portugal satisfied the dual transformation requirement. The court determined that a substantial transformation occurs if a manufacturing process results in an article of commerce which has a distinctive name, character, or use. 596 F.Supp. at 1086, (citing Texas Instruments, Inc. v. United States, 681 F.2d 778, 782 (CCPA 1982)). Here, the court held, the swaging process constitutes an initial transformation, and the succeeding processes constitute the second. The swage blanks, the court said, have a distinctive name, a different character from the wire segments from which they are made, and a specific use. Moreover, the swages are “articles of commerce” because, on the two documented occasions set forth in the stipulations, they have been the object of large transactions. Thus, the court concluded that the swaged needle blanks are constituent materials of which the needles are made, and their value (which includes the value of the non-BDC wire) should be included in the 35% value added calculation.
II.

The dual transformation requirement.

The parties disagree whether the GSP statute and regulations mandate a dual transformation between raw material and finished product if the latter is to be granted duty-free entry. Torrington contends that its transformation of the non-BDC wire into sewing machine needles — even if considered only a single transformation— was in itself sufficient. The Government counters that a single transformation is insufficient to change the non-BDC wire into a material “produced in the developing country” which, if used in the BDC, may then be considered in the BDC-content evaluation.
Like the CIT, we think that the statutory language of 19 U.S.C. § 2463(b) leads to the Government’s position. Congress authorized the Customs Service to consider the “cost or value of materials produced ” in the BDC. (Emphasis added.) The parties agree that the wire clearly was not a BDC product. As wire, therefore, it may not be considered a BDC material. However, if Torrington Portuguesa transformed the wire into an intermediate article of commerce, then the intermediate product would be an article produced in the BDC, and the value of that product (including the contribution of the wire to the value of that intermediate product) would be included.
The legislative history of § 2463 supports this reading. Congress used the content requirement to protect the GSP program from untoward manipulation:
The percentage ... assure[s] that, to the maximum extent possible, the preferences provide benefits to developing countries without stimulating the development of “pass-through” operations the major benefit of which accrues to enterprises in developed countries.
*1568 H.Rep. No. 571, supra, at 86-87. In the absence of a dual transformation requirement, developed countries could establish a BDC as a base to complete manufacture of goods which have already undergone extensive processing. The single substantial transformation would qualify the resulting article for GSP treatment, with the non-BDC country reaping the benefit of duty-free treatment for goods which it essentially produced. This flouts Congress’ expressed intention to confer the benefits of the GSP fully on the BDC and to avoid conferring duty-free status on the products of a “pass-through” operation.
Moreover, Torrington’s contentions, if accepted, would tend to render the 35% requirement a nullity. If only a single transformation were necessary, then the “material produced” in the BDC as a result of this transformation would be the imported product itself.[4] Customs would then face the problem of determining how much of the appraised value of the import resulted from materials produced in the BDC, when the only material produced was the import. The result would always be 100% since the product would always be a constituent material of itself. Congress clearly envisaged some way of separating the final product from its constituent materials, and the dual transformation requirement achieves this end.
Our predecessor court’s ruling in Texas Instruments, supra, supports this reading of the statute, although the dual transformation requirement was not expressly considered as a separate issue. Texas Instruments concerned cue modules for cameras composed primarily of integrated circuits, a photo-diode, a capacitor and a resistor. The court ruled that these cue modules could enter the United States duty-free under the GSP even though the silicon slices which ultimately went into the integrated circuits and photodiode came originally from the United States. The issue on which the court focused its attention was whether the assembly of the component parts into a cue module could in itself constitute a substantial transformation from one product to another.[5] The court ruled in the affirmative, and clearly indicated that it considered this assembly to be the second substantial transformation, the first having been satisfied when the silicon slices were manufactured into separate, packaged silicon chips. 681 F.2d at 783-84.
III.
The swages — substantial transformation into a new and different article of commerce.
A. In Texas Instruments, supra, the Court of Customs and Patent Appeals adopted the rule, well-established in other areas of customs jurisprudence, that a substantial transformation occurs when an article emerges from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process. 681 F.2d at 782; cf. Anheuser-Busch Brewing Assn. v. United States, 207 U.S. 556, 28 S.Ct. 204, 52 L.Ed. 336 (1908). The CIT determined here that this substantial transformation test was satisfied when Torrington Po-rtuguesa manufactured needle swages from the wire.
The parties’ stipulations sustain the CIT’s conclusion. Two critical manufacturing steps separate three items (wire, swage and needle) each of which is markedly different from the others. The initial wire is a raw material and possesses nothing in its character which indicates either the swages or the final product. The intermediate articles — the swages — have a definite size and shape which renders them suitable for further manufacturing into needles with various capabilities. At that phase of the production process the material which emerges is more refined, possesses attributes more specifically applicable to a given use, *1569 and has lost the identifying characteristics of its constituent material. It is a new and different article.
This conclusion finds support in prior cases and administrative decisions which have considered whether a given manufacturing process entails a substantial transformation from one article to another.[6] Manufacturing processes often differ in detail, but we must consider these differences in light of the GSP’s fundamental purpose of promoting industrialization in lesser developed countries. Trivial differences in manufacturing processes or techniques will not affect the overall benefit conferred upon the BDCs from the manufacturing conducted in those countries.
A prime source of information in this area of Customs jurisprudence is T.D. 78-400, 12 Cust.B. & Dec. 875 (1978), in which the Treasury Department considered the effect of certain processes in the manufacture of specific types of electric motors for GSP purposes. In the production of a 600 series d.c. motor the manufacturer produced the rear housing assembly in a BDC from flat steel stock of U.S. origin. The manufacturer drew the steel stock through a series of dies to form the cup-shaped motor part. The Department was of the opinion that “the flat steel stock which is drawn into the cup-shaped rear housing is a substantially transformed constituent material, and the entire cost of its component is includable in the costs of materials in computing the 35-per-cent criterion.” Id,., 12 Cust.B. & Dec. at 676. The Customs Service therefore included the value of this rear housing — which included the value of “its component” (the steel stock) — in the content evaluation. Throughout T.D. 78-400, it was held that various processes which involved the stamping, dying or molding of metal from a formless article into a shaped component constituted a substantial transformation.
The process by which Torrington Po-rtuguesa formed the swage needle blanks is very similar. A swage is similar to a die and presses metal into a given shape. This new shape results in a product with a new use, a given name different from its component article, and with special characteristics.
Judicial precedent is comparable. For example, in United States v. Pittsburgh Plate Glass Co., 44 C.C.P.A. (Customs) 110 (1957), the court ruled that certain glass louvers were properly classifiable as “manufactures of glass” rather than as plate glass. The court specifically noted that to be a manufacture, the glass must have a different name, character or use from the original material. Id. at 116. The court concluded:
The imported glass louvers were no longer merely sheet glass____ They had a new name ... or several names by all of which the trade witnesses referred to them____ The new characteristics were two webered, round, smooth edges and a specific size. The new use was as jalousie louvers, at least predominantly. As such they were completely manufactured articles.
Id. Comparably, the swages in this case were no longer wire; they had a new name by which they were known in the trade; they had new characteristics, including a new shape and size; they had a specific use in the production of needles. “As such they were completely manufactured articles.” Id.
B. The CIT also concluded correctly that the swages were “articles of commerce.” The Government attacks this determination principally by arguing that the two incidents in which Torrington Po-rtuguesa transferred swages to Torrington in this country should not count in deciding whether swages are articles of commerce. We note initially that the phrase “article of *1570 commerce” is found only in the regulation, not in the GSP statute, and therefore we interpret the “of commerce” requirement of the regulation in light of the statute’s purpose to further BDC industrialization. By emphasizing that the article must be “of commerce,” the Customs regulation imposes the requirement that the “new and different” product be commercially recognizable as a different article, i.e., that the “new and different” article be readily susceptible of trade, and be an item that persons might well wish to buy and acquire for their own purposes of consumption or production.
Two administrative decisions concerning GSP treatment for imported chemicals[7] are consonant with this view. In T.D. 77-273, 11 Cust.B. & Dec. 551 (1977), the Treasury Department concluded that an intermediate chemical (dichloro) involved in the production of technical atrazine does not satisfy the dual substantial transformation requirement. The agency reached this conclusion because
(1) the process used to manufacture the technical atrazine is essentially a continuous process, (2) dichloro is not a chemical that is generally bought and sold, and (3) the dichloro resulting in the first step of the Israeli manufacture of technical atra-zine would have to be refined (the impurities removed) in order to make shipping practicable.
Id., 11 Cust.B. & Dec. at 553-54. In other words, the dichloro was not the result of a first substantial transformation because it was not an “article of commerce,” even though the dichloro differed chemically both from the constituent articles from which it was made and the final article, technical atrazine. In sharp contrast, the Customs Service ruled in C.S.D. 79-311, 13 CustB. & Dec. 1463 (1979), that another chemical process did include a “substantially transformed constituent material within the meaning of [19 C.F.R. § 10.177(a)(2) ].” Id. The Customs Service reasoned:
The evidence includes examples where the product’s characterization, preparation process, and uses are enumerated in chemical reference sources. There is a patent on a process by which this product is prepared. A copy of a letter was produced in which an unrelated party indicated willingness to produce and sell this product at a specific price.
Id., 13 Cust.B. & Dec. at 1463-64.
Our conclusion is that an “article of commerce” — for the purposes of the pertinent Customs regulation — is one that is ready to be put into a stream of commerce, but need not have actually been bought- and-sold, or actually traded, in the past. Indeed, by requiring proof of actual arms-length transactions by unrelated parties, the Government implies that a new article (never before produced) can never be an article of commerce entitled to GSP treatment — a result not envisaged by Congress. In this instance, we agree with the CIT that the transfer of over four million swaged needle blanks from Torrington Portuguesa to Torrington is an adequate showing that swaged needle blanks are articles of commerce. There is no reason to believe that those articles could and would not be sold to other manufacturers of needles who wanted to purchase them for further manufacture into the final product.
IV.
The needles — substantial transformation into a new and different article.
The Government urges that, even if the production of swages from wire constitutes a substantial transformation, the manufacture of the needles from the swages does not.[8] We are referred to paragraph 13 of the parties’ stipulations, in which they note *1571 that swages “are dedicated for use solely as sewing machine needles with a predetermined blade diameter____ In the majority of cases, a particular type of swaged needle blank becomes only a single particular type of needle.” The Government concludes from this that the swages are actually unfinished needles, and do not undergo a substantial transformation into a new article in order to reach their final form. Torrington, also reading from the stipulations, notes that the swages lack the key characteristics of a needle since they have ■no points or eyes, and that a given swage can be processed into needles with different properties, e.g., eye size.
The Government relies for its position that swages are merely unfinished needles on cases such as Avins Industrial Products Co. v. United States, 515 F.2d 782, 62 C.C.P.A. 83 (1975) and Lee Enterprises, Inc. v. United States, 84 Cust.Ct. 208 (1980). These decisions concern the proper classification of imports under the rule that an item in the TSUS covers the article mentioned in finished or unfinished form. The courts ruled that a product is an unfinished form of an article if the product has been manufactured to the point where it is dedicated solely to the manufacture of that article. Avins, supra, 515 F.2d at 783. However, the Government’s reliance on these cases is not pertinent. The proper tariff classification is not dispositive of whether the manufacturing process necessary to complete an article constitutes a substantial transformation from the original material to the final product. Belcrest Linens, supra, 741 F.2d at 1373. Instead, we look — keeping in mind the GSP’s fundamental purpose of fostering industrialization in BDCs — to the actual manufacturing process by which the intermediate article becomes the final product.
In Midwood Industries v. United States, 64 Cust.Ct. 499, 313 F.Supp. 951 (1970), the Customs Court (now the CIT) determined that forgings for flanges could enter the United States without permanent country-of-origin markings because the importer substantially transformed the forgings in the United States into pipe.[9] In one case, the importer cut the edges; tapered, be-velled and bored the ends; and removed die lines and other imperfections from the surface of the final article. 313 F.Supp. at 955. The court also heard testimony that, in their imported state, the forgings are useless unless processed into the final flange. Id. at 955-56. The decision in that case was that the importer’s efforts resulted in a substantial transformation from the rough forgings into “different articles having a new name, character and use.” Id. at 957. The court noted that the “imports were producers’ goods, and the flanges are consumers’ goods,” and held: “While it may be true, as some of the testimony of record indicates, that some of the imported forgings are made as close to the dimensions of the ultimate finished form as possible, they, nevertheless, remain forgings unless and until converted by some manufacturer into consumers’ goods.” Id. (emphasis in original).
The production of needles from swages is a similar process. The swages are bored (to form an eye), the ridge is carved, and the needle is pointed, cleaned, hardened, plated, etc. The swage is also the approximate size necessary to create the final needle, but, like the forgings in Midwood, they are producers’ goods. The final needles are consumers’ goods. The production of needles from swages is clearly a significant manufacturing process, and not a mere “pass-through” operation as the Government apparently contends. Portugal certainly reaps the benefit of this manufacturing process; indeed, short of manufacturing the wire itself, Torrington Portuguesa could do no more than it already does in the production of needles. In these circumstances, we think that Congress intended the GSP statute to apply.
*1572 For these reasons, we conclude: (1) that a dual substantial transformation in a BDC is a prerequisite for GSP treatment under the GSP statute and Customs regulations, (2) that the swages which Torrington Po-rtuguesa produced are a separate, intermediate “article of commerce,” and (3) that the industrial sewing-machine needles imported by Torrington are entitled to duty-free entry. The decision appealed from is therefore affirmed.
AFFIRMED.

. See Graham, The U.S. Generalized System of Preferences for Developing Countries: International Innovation and the Art of the Possible, 72 Am.J.Int’l.L. 513 (1978).

. See H.Rep. No. 571, 93d Cong., 1st Sess. 86-87 (1973) (for a discussion of the rationale behind the content requirement).

. The trial court ruled that two entries, numbers 211431 and 210816, were not entitled to GSP treatment because Torrington failed to file the appropriate certificate of origin forms as required by Customs regulations. Torrington has not appealed from this ruling.

. I.e., the product imported into the United States, seeking GSP status.

. The Treasury Department had indicated that, in its view, no mere assembly could ever constitute a substantial transformation. See T.D. 76-100, 10 Cust.Bull. & Dec. 176, 178 (1976); Texas Instruments v. United States, 2 C.I.T. 36, 520 F.Supp. 1216, rev'd, 681 F.2d 778 (CCPA 1982).

. We need not look only at GSP cases (which are scarce) to determine when a substantial transformation takes place. Whether a substantial transformation has occurred is of importance in many other areas of customs law, and reference to cases from these other areas is often helpful unless the principles enunciated in those cases hinge specifically on the underlying statutes there at issue. See Belcrest Linens v. United States, 741 F.2d 1368, 1372 (Fed.Cir. 1984).

. Apparently, the administrative decisions concerning chemical imports have been the only ones to address the "article of commerce" requirement explicitly. See Cutler, The United States Generalized System of Preferences: The Problem of Substantial Transformation, N.CJ. Int’I L. & Com.Reg. (1980). In T.D. 78-400, supra, for example, the Treasury Department did not mention whether rear housing assemblies or other motor parts have been or could be traded in commerce.

. Clearly the needles themselves are "articles of commerce".

. The country-of-origin marking regulations define "country of origin” as the country in which an article is manufactured in toto, or a country in which imported products are "substantially transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed.” 19 C.F.R. § 177.22 (1984).