F.F. ZUNIGA A/C REFRACTARIOS MONTERREY, S.A., PLAINTIFFS *v.*
UNITED STATES, DEFENDANT

Court No. 79–11–01684

(Dated June 12, 1992)

*Stein Shostak Shostak & O'Hara*, (*Robert Glenn White, Marjorie M. Shostak*), for plaintiffs.
*Stuart M. Gerson*, Assistant Attorney General; *Joseph I. Liebman*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, (*Saul Davis*); (*Stephen Berke*, U.S. Customs Service, Of Counsel), for defendant.

### MEMORANDUM OPINION AND ORDER

GOLDBERG, *Judge:* Plaintiffs challenge the classification of merchandise imported from Mexico and described as kiln furniture, which is shaped refractory articles that hold ceramicware during firing. The Customs Service ("Customs") classified the merchandise as shaped refractory articles not specially provided for, under Item 531.39, Tariff Schedules of the United States ("TSUS"), with a duty rate of 7.5 percent *ad valorem*. Plaintiffs assert the merchandise is entitled to entry free of duty under Item A531.39, TSUS, a provision providing duty free treatment under the Generalized System of Preferences ("GSP"). The court holds that the merchandise was properly classified under Item 531.39, TSUS, and issues judgment for defendant.

BACKGROUND

Plaintiff F.F. Zuniga is the importer of record of the merchandise and plaintiff Refractarios Monterrey, S.A. is the manufacturer and exporter of the imported merchandise. The merchandise entered the United States in 1978 and 1979 at the port of Laredo, Texas.

The parties agree upon the basic underlying facts. The subject merchandise, the imported kiln furniture, is composed of several dry ingredients, including kaolin, clay, sierralite talc, and calcined kaolin or mullite. These dry component materials were United States products and exported in their raw form to plaintiffs in Mexico.

The parties stipulated that, and Mr. Harold L. Turk, the president and chief executive officer of plaintiff Refractarios Monterrey, S.A. confirmed by testimony at trial that, plaintiff Refractarios Monterrey, S.A. received the clay and talc components in a lump or rock-shaped form. The parties also stipulated that all other dry ingredients used in the process were received pre-ground.

The component dry ingredients then underwent a multiple step processing operation before the finished merchandise was exported to the United States. During the processing operation, the clay and talc were individually finely ground. Next, water was placed in a mixer, called a blunger, and the individual dry ingredients, the dispersing agents, and defloculants, were then added. The resulting mixture, termed "casting slip", was removed from the blunger and poured into molds. The molded casting slip was now called "greenware". After a period of hours, the greenware was extracted from the molds and dried. Finally, the greenware was fired at extremely high temperatures in a kiln to form the final imported merchandise. During firing, a chemical transformation occurred, which created a mineral named "cordierite" within the product. The presence of cordierite enabled the imported merchandise to maintain high thermal shock resistance and low thermal expansion during its subsequent use. The finished kiln furniture had strong "sag resistance," in that it was able to support another product during firing at high temperatures without sagging.

The parties stipulated that plaintiffs' formula for making the imported merchandise was kept by plaintiff Refractarios Monterrey, S.A. as confidential business information.

At trial, plaintiffs contended that the merchandise was substantially transformed into at least one intermediate product during the operations, and therefore qualified for GSP duty-free treatment. In support of this theory, plaintiffs introduced the testimony of Mr. Turk, and briefly called Mr. Reynaldo Pena on rebuttal. Mr. Pena, originally scheduled to testify on behalf of defendant, was a Customs import specialist at the port of importation in Laredo, Texas. Mr. Ron Garland, the business manager of the kiln furniture division for Ferro Corporation, a competitor of plaintiffs, and Mr. William C. Mohr, a retired Ferro Corporation laboratory manager whose work primarily involved cordierite refractory materials, appeared on behalf of defendant.

The court finds that the merchandise did not undergo the dual substantial transformation necessary for GSP entry.

DISCUSSION

*I. Standard of Review:*

The court must evaluate "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States,* 733 F.2d 873, 878 (Fed. Cir. 1984), *reh'g denied,* 739 F.2d 628 (Fed. Cir. 1984). Pursuant to 28 U.S.C. § 2639(a)(1) (1988), the government's classification is presumed to be correct and the burden of proof is upon the party challenging the classification.

*II. The Dual Substantial Transformation Requirement:*

Under the GSP provision applicable during the period of the importations, a product imported directly from a beneficiary developing country ("BDC") may enter the United States duty free providing the sum of:

> (i) the cost or value of the materials produced in the beneficiary developing country plus (ii) the direct costs of processing operations performed in such beneficiary developing country is not less than 35 percent of the appraised value of such article at the time of its entry. * * *

19 U.S.C. § 2463(b)(2)(A) (1976)[1]. *See also* General Headnote 3(c)(ii), TSUS.

Customs regulations at 19 C.F.R. § 10.177(a) (1992)[2], provide in part that:

> (a) *"Produced in the beneficiary developing country" defined.* * * * [T]he words produced in the beneficiary developing "country" refer to the constituent materials of which the eligible article is composed which are either:
>
> > (1) Wholly the growth, product, or manufacture of the beneficiary developing country; or
> > (2) Substantially transformed in the beneficiary developing country into a new and different article of commerce.

The court in *Torrington Co. v. United States,* 8 CIT 150, 153, 596 F. Supp. 1083 (1984), *aff'd,* 764 F.2d 1563 (Fed. Cir. 1985), furnished guidelines for determining whether imported constituent materials qualify as "materials produced" in the BDC:

> It is clear that before a non-BDC material can be regarded as a "material produced" in the BDC, with its cost includable in the evaluation by Customs, the non-BDC material must be substantially transformed into a new and different article of commerce, that is, one having a distinctive name, character or use.

---

[1] The statute has been subsequently amended; however, the relevant textual provisions remained unchanged.

[2] Subsection (a) of Title 19 of Code of Federal Regulations § 10.177 remains identical in relevant part to the regulations in effect during the dates of the importations. .

*Torrington* delineated that a two-stage substantial transformation process was necessary before non-BDC products could be regarded as "material produced" in the BDC, and included in the 35 percent value-added evaluation. The non-BDC material must first be substantially transformed into:

> a new and different article of commerce which becomes "material produced," and these materials produced in the BDC must then be substantially transformed into a new and different article of commerce.

*Torrington*, 8 CIT at 153. *See also Azteca Milling Co. v. United States*, 890 F.2d 1150 (Fed. Cir. 1989).

The parties agreed that the direct cost alone of the processing operations performed in Mexico on the imported merchandise, as provided by subsection (ii) of 19 USC 2463(b) (1976), was less than 35 percent of the appraised value of the product at the time of its entry. Instead, plaintiffs contended that the value of "materials produced" in Mexico pursuant to subsection (i) of 19 USC 2463(b) (1976), in conjunction with the direct costs of production in Mexico under subsection (ii), satisfied the 35 percent minimum. Defendant only stipulated that this 35 percent minimum would be met if the court agreed to consider the cost of the American raw materials in calculating the value of the "materials produced" in Mexico.

Accordingly, the court must determine whether plaintiffs established at trial that the raw materials imported into Mexico from the United States underwent an initial substantial transformation into a "new and different" article of commerce, and that this "material produced" was substantially transformed in Mexico into another "new and different" article of commerce.

*III. "New and Different" Article of Commerce Analysis:*

In order to satisfy the dual substantial transformation requirement, plaintiffs must first show that the raw materials imported from the United States were substantially transformed into an intermediate product, or "new and different" article. In *Torrington*, this court defined substantial transformation as occurring "when an article emerges from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process." *Torrington Co. v. United States*, 764 F.2d at 1568 (quoting *Texas Instruments, Inc. v. United States*, 681 F.2d 778 (CCPA 1982)).

In *Torrington*, the Federal Circuit affirmed the CIT holding that industrial sewing machine needles exported from a BDC, but manufactured from non-BDC wire, were eligible for GSP treatment because the dual substantial transformation had occurred. In the BDC, the wire was first shaped into a swage needle by cutting, beveling, and altering its length and circumference. The swage needle was then further processed into a finished sewing machine needle. *Torrington* found that swage needles were an intermediate "new and different" article because they were more refined, and possessed a definite size and shape suitable for

further manufacturing into needles, while having lost the identifying characteristics of wire. *See Torrington*, 764 F.2d at 1568–1569.

To the contrary, the court in *Azteca*, 890 F.2d at 1150, determined that Mexican prepared corn flour products were not substantially transformed materials. Corn on the cob imported from the United States was cleaned, weighed, and then cooked to form a product called "nixtamal." Nixtamal was next steeped and washed to form "masa", and then processed into tamale flour. Lastly, it was sifted into its final form of corn flour products. The court held that preparation of corn flour products was essentially a continuous process, and nixtamal, masa, and tamale flour remained "clearly recognizable as processed corn." *Azteca Milling Co. v. United States*, 12 CIT 1153, 1158–1159, 703 F. Supp. 949 (1988), *aff'd*, 890 F.2d 1150 (Fed. Cir. 1989). The court concluded that a dual substantial transformation had not occurred since none of the intermediate products lost the essential identifying characteristics of corn.

Plaintiffs must also demonstrate that the "new and different" intermediate product was recognized as a separate article of commerce. An article of commerce is one that is "readily susceptible of trade, and [is] an item that persons might well wish to buy and acquire for their own purposes of consumption or production." *Torrington*, 764 F.2d at 1570. The product must be ready to be put into the stream of commerce, but need not previously have been actually bought-and-sold or traded. However, "the lack of purchases and sales is nevertheless a factor to be considered in determining whether a product or merchandise is an article of commerce." *Azteca*, 12 CIT at 1160.

*Torrington* found that swage needles were a separate article of commerce because two large transfers of the needles had occurred between plaintiff and a subsidiary. The court noted that there was "no reason to believe that [swages] could and would not be sold to other manufacturers of needles who wanted to purchase them for further manufacture into the final product." *Torrington*, 764 F.2d at 1570.

*Azteca*, however, concluded that the intermediate products in its case were not separate articles of commerce. In *Azteca*, plaintiff failed to show any history of commercial transactions involving the intermediate products. The evidence also established that plaintiff's nixtamal was unsuitable for commercial sale because traditionally manufactured nixtamal purchased by consumers had a higher moisture content than plaintiff's. The court concluded that the intermediate products were not readily marketable since they were only "materials in process, advancing toward the finished product." *Azteca*, 12 CIT at 1160.

In the case at bar, plaintiffs contended at trial that at least one of three intermediate products, a mixture of the dry ingredients called "castables", casting slip, or greenware, was a sufficiently transformed "new and different" article of commerce.

*A. Kiln Furniture Castables:*

Mr. Garland, on behalf of defendant, and Mr. Turk, on behalf of plaintiffs, testified that a pre-mix of the dry ingredients used in the manufacture of kiln furniture would be identified as a "castable". However, both witnesses stated that castables were not actually created in the production of kiln furniture. Instead, the dry ingredients were individually added into the blunger, which already contained water. Witnesses Turk and Garland emphasized that at the time the imported merchandise entered the United States, it was not plaintiffs' practice to pre-mix any of the dry ingredients together.

The court finds, therefore, that plaintiffs failed to show that castables were formulated during the production of kiln furniture, and consequently castables were not a "new and different" product.

Plaintiffs additionally failed to establish that "castables" were articles of commerce. During trial, plaintiffs could not, by definition, demonstrate commercial recognition of a product which was never fabricated. Therefore, plaintiffs relied first on the principle of "functional equivalence." In this theory, Customs has held that an importer can use sales evidence of a "functional equivalent" to demonstrate a commercial market for its own related product. *See* C.S.D. 80–34, 14 Cust. Bull. 780, (1979). A "functional equivalent" is defined as a product which is of the "same general class or kind" as the article at issue. C.S.D. 80–34, 14 Cust. Bull. 780 (1979).

The only evidence presented by plaintiffs regarding sales of the functional equivalent of kiln furniture castables generally was Mr. Turks's testimony that chemically distinct, non-cordierite forming castables used for the manufacture of products unrelated to kiln furniture were commercially available. However, plaintiffs' anemic showing is insufficient to establish that the dissimilar castables on the market were the same "class or kind" as the potential kiln furniture castable.

Plaintiffs were also unable to show that kiln furniture castables, if ever actually formulated, were "readily susceptible of trade." *Torrington*, 764 F.2d at 1570. The single item of evidence introduced on this point was to the contrary. Mr. Garland, a defense witness, stated that Ferro Corporation, a competitor of plaintiff Refractarios Monterrey, S.A., would refrain from selling castables for use in the manufacture of kiln furniture because competitors could easily ascertain the confidential chemical composition of its kiln furniture from the castable.

Therefore, the court concludes that plaintiffs failed to show that castables used in the production of kiln furniture were substantially transformed "new and different" articles of commerce.

*B. Kiln Furniture Casting Slip:*

Plaintiffs alternatively claimed at trial that casting slip, the mixture created by blending the dry ingredients, the defloculants and dispersants with water in the blunger, was a substantially transformed "new and different" article of commerce. The court again finds that plaintiffs

failed to satisfy the burden of showing that casting slip was both a "new and different" article, and was commercially recognized.

The only relevant evidence adduced by plaintiffs at trial to show that a substantial transformation occurred was Mr. Turk's general description of the mixing process. He stated simply that the dry ingredients, defloculants, dispersants, and water were mixed in the blunger for "a couple of hours, however, we keep [the slip] in the blunger and age it 12 or 24 hours before using it into the mold." (Transcript at 152.)

This spare showing is inadequate to prove that slip was chemically distinct from its dry ingredients. This simple addition of water and dispersing agents did not cause the casting slip to lose the "identifying characteristics" of its components. *See Azteca,* 890 F.2d at 1150. The court finds in fact that this case bears a strong similarity to C.S.D. 80–34, 14 Cust. Bull. 780 (1979). In that action, Customs found that mixing a chemical named Naproxen with a starch excipient was not a processing operation that resulted in a substantial transformation; it was merely a "diluting process." *Id.* at 782–783.

Accordingly, the court determines that casting slip remained clearly recognizable as a simple blend of its dry ingredients, and was not a substantially transformed "new and different" article.

The evidence introduced at trial also established that casting slip produced by plaintiffs was not an article of commerce. In their attempt to show commercial recognition of kiln furniture casting slip, plaintiffs used four alternative arguments, each of which does not pass muster. Plaintiffs first claimed that actual commercial transactions of casting slip occurred. However, the only evidence proffered by plaintiffs to support this assertion consisted of Mr. Turk's statement that he had denied one inquiry to sell the slip because the requested quantity was insignificant. This solitary "potential" sale alone is insufficient to demonstrate commercial availability of kiln furniture casting slip.

Alternatively, plaintiffs suggested that kiln furniture casting slip was "readily susceptible of trade," and therefore an article of commerce since actual sales of the merchandise were not imperative. *See Torrington,* 764 F.2d at 1570. Again, all evidence introduced at trial was inapposite. Mr. Turk and Mr. Garland testified without contradiction that commercial sales of slip were untenable because competitors could deduce the confidential formula for kiln furniture from an examination of slip.

Defendant also produced evidence that commercial sales of casting slip were not economically feasible. Mr. Garland testified that a manufacturer of casting slip could not sell the slip at a competitive price to a manufacturer and user of the slip because the casting slip seller must absorb transportation, labor, and profit costs which the manufacturer/ user need not. Both Mr. Garland and Mr. Mohr also testified that kiln furniture casting slip was not readily salable because the slip did not remain in suspension after removal from the blunger. The constant set-

tling of solids within the slip necessitated expensive and thorough re-mixing by the purchaser.

The court determines that the evidence presented decisively established that kiln furniture casting slip was not "readily susceptible of trade" and did not possess any potential for commercial sales. Consequently, the court must look to plaintiffs third contention that slip is an article of commerce because its "functional equivalent" was commercially recognized. In support, plaintiffs elicited evidence that a variety of slips were commercially marketed. However, the unrebutted testimony of Mr. Garland and Mr. Mohr demonstrated that these commercially traded slips were significantly distinct from the slip at issue. They were composed of numerous different ingredients and were used for unrelated purposes, such as the manufacture of whiteware or by hobbyists for non-cordierite ceramicware. None of the marketed slips were usable in kiln furniture manufacture because the finished product would be unable to withstand the high temperatures to which kiln furniture was repeatedly exposed. Again, the court must reject plaintiffs' argument as being totally unsupported by the evidence.

Finally, plaintiffs asserted that kiln furniture casting slip was used, or could be used, in the manufacture of other commercially marketed products, and consequently it was an article of commerce. However, plaintiffs likewise neglected to factually support their theory at trial.

Plaintiffs failed to present any evidence of actual sales of kiln furniture casting slip to anyone for any purpose. Plaintiffs did not present evidence that slip could be used in the production of other products. In fact, uncontradicted testimony demonstrated that use of kiln furniture slip for other purposes was not feasible. Mr. Mohr testified that slip contained expensive ingredients unnecessary to hobbyists or other non-kiln furniture manufactures. Moreover, Mr. Garland noted that kiln furniture casting slip is not suitable for hobbyists because finished products had an unattractive, rough texture.

The court determines that plaintiffs failed to establish that kiln furniture casting slip was commercially recognized. In this regard, the court finds Customs' ruling in C.S.D. 80–4, 14 Cust. Bull. 729 (1979) instructive. In that decision, Customs determined that production of an intermediate chemical, monoester, that was immediately esterified to produce a final chemical compound, was not a substantially transformed constituent material. Customs held that the process was continuous, and that monoester was only a "transitional stage" since it was not commercially traded, remained relatively unstable, and was not economically isolated for trade. Similarly, the court determines that casting slip produced by plaintiffs for the manufacture of kiln furniture was not a substantially transformed "new and different" article of commerce. The casting slip was only a "transitional stage" of a "material[ ] in process, advancing toward the finished product" of the imported kiln furniture. See Azteca, 12 CIT at 1160.

## C. Kiln Furniture Greenware:

In their last and unsuccessful bid to satisfy the dual substantial transformation requirement, plaintiffs argued that greenware was a substantially transformed "new and different" article of commerce.

However, the only relevant evidence produced by plaintiffs at trial to show that greenware had undergone a substantial transformation was Mr. Mohr's testimony that a significant transformation occurred *after* manufacture of the greenware, during firing of the greenware, when cordierite was formed. No evidence was introduced to show that greenware lost the "identifying characteristics" of its component ingredients, or that it emerged from the manufacturing process with a different character or use than its component materials. *See Torrington*, 764 F.2d at 1568–1569.

Similarly, plaintiffs failed to demonstrate that greenware was a commercially recognized article. The testimony introduced on this point was brief, and inadequate. Mr. Garland stated that commercially marketed greenware, which included fireplace logs, statues, and cups, were fabricated from "a totally different formulation" than kiln furniture greenware that was unsuitable for use in manufacturing kiln furniture. (Transcript at 46.) He noted that neither hobbyists nor whiteware manufacturers could fire kiln furniture greenware because the kilns used by these producers did not reach temperatures sufficient to create cordierite.

Mr. Garland's unrebutted testimony also indicated that greenware was not readily susceptible of trade. He stated that greenware was so "fragile that I can't imagine how you can possibly ship it to its destination in an economic manner." (Transcript at 44.) Furthermore, Mr. Garland noted that, as with casting slip, the confidential formula for kiln furniture could be determined by analyzing a sample of greenware.

### CONCLUSION

After examination of the testimony and exhibits introduced at trial, and the relevant statutory and case law, the court determines that plaintiffs failed to establish that an intermediate and substantially transformed "new and different" article of commerce was created in the manufacture of the imported merchandise. Plaintiffs did not meet the two-stage substantial transformation necessary for GSP duty-free treatment. Therefore, the court finds that plaintiffs did not overcome the presumption of correctness which attaches to the government's classification and that the imported merchandise was properly classified under Item 531.39, TSUS. Judgment will enter accordingly.