**Slip Op. 00-93**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before: Judge Judith M. Barzilay**

---------------------------------------------------- x

SASSY, INC.                                          :

       Plaintiff,                              :                    Court No.  95-07-00882

       v.                                      :

UNITED STATES OF AMERICA,                            :

       Defendant.                              :

---------------------------------------------------- x


Decided:  August 2, 2000.

*Neville, Peterson & Williams (John M. Peterson, Curtis W. Knauss)* for Plaintiff.
*David W. Ogden*, Acting Assistant Attorney General, *Joseph I. Liebman*, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Bruce N. Stratvert*), *Chi S. Choy*, Office of  Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of counsel, for Defendant.


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**BARZILAY,  JUDGE:**

**I.  INTRODUCTION**

Plaintiff, Sassy, Inc. ("Sassy"), imports pacifiers from Austria.  The pacifiers in issue are model number 513, known as MAM MINI ULTI and model number 505, known as MAM ULTI MAM.  The United States Customs Service ("Customs") classified the subject merchandise under subheading

3926.90.15 of the Harmonized Tariff Schedule of the United States ("HTSUS"), at a rate of 3.1% *ad valorem*. The classification of the merchandise is not in dispute; rather, the issue is whether the products were eligible to enter duty free under the Generalized System of Preferences ("GSP"). On May 5, 1999, this case was designated as a test case pursuant to USCIT R. 84(b).

In *Sassy, Inc. v. United States*, Slip Op. 99-60, 1999 WL 507537, (CIT July 13, 1999), this court denied Plaintiff's motion for partial summary judgment and Defendant's cross motion for summary judgment. As a result, a bench trial was held on April 26 and 27, 2000. Pursuant to USCIT R. 52(a), the court enters judgment for Defendant.

## II. FINDINGS OF FACT

1. On July 21, 1993, the subject merchandise entered at the port of Detroit, MI under entry number 813-0117718-4.

2. The company MAM manufactures the subject merchandise, which is then imported into the United States by Sassy. Trial Transcript ("Tr.") at 15 (testimony of Homer Douglas, Vice-President of Operations for Sassy, Inc.). Sassy has a contractual agreement with MAM to be the exclusive distributor of MAM's pacifiers in the United States. Tr. at 16 (Douglas testimony). Sassy does not sell its pacifiers in any country other than the United States. Tr. at 50 (Douglas testimony).

3. MAM has sales and general offices in Austria and manufacturing operations in Hungary. Tr. at 90 (Douglas testimony).

4. At the time of entry, Hungary was designated as a beneficiary developing country under the GSP.

5. The MAM MINI ULTI and MAM ULTI MAM are alike in all material respects.

6. The pacifiers are composed of four component parts: 1) a knob; 2) a shield; 3) a latex rubber

nipple; and 4) a plastic retainer plug. The component parts were so identified by name by all of the witnesses testifying. Tr. at *passim*.

7. The four pacifier components are not produced or manufactured in Hungary. Tr. at 128-29 (Douglas testimony). The pacifiers are marked as "Made in Austria" because the one time Sassy attempted to mark them as "Made in Hungary" Customs contested the country of origin marking. Tr. at 117-20, 123-26 (Douglas testimony).

8. The rubber nipple is designed for the child to suck, the retainer plug holds the nipple inside the shield, the shield prevents the pacifier from being able to be swallowed, and the knob holds the pacifier together. Tr. at 22-23 (Douglas testimony).

9. The component parts are received and made into a pacifier in Hungary.

10. The court finds highly probative Plaintiff's Exhibit 5, a video tape made in 1993 depicting the manufacturing operation in Hungary. In addition to the manufacturing operation, there were tool shops and inventory facilities in Hungary. Tr. at 29, 60 (Douglas testimony).

11. The manufacturing operation in Hungary begins with a worker taking the component parts from a box and assembling the parts together. Pl.'s Ex. 5; Tr. at 30 (Douglas testimony).

12. After the parts are assembled, they are placed onto the fixture of an ultrasonic welder, which then rotates so that the horn of the welder may contact the knob and apply the weld. Pl.'s Ex. 5; Tr. at 32-36 (Douglas testimony). Ultrasonic welding is the assembly of two component parts by a transformation of electrical energy into mechanical energy. The welding occurs through the vibration of the parts and is facilitated by an energy director. Tr. at 240-41 (testimony of Marshall Aberle, consultant to Sassy, Inc. ). An energy director is a "v" shape molded into the components

to be joined where the parts meet to improve the bond. Tr. at 244 (Aberle testimony).

13. Once welded, the pacifier is subjected to a pull test, which is done by a mechanical device that grabs the latex rubber nipple and pulls to a force of 35 pounds. Pl.'s Ex. 5; Tr. at 40 (Douglas testimony).

14. At some point in the process in Hungary, the shield of the pacifier is laser coded with the month, date and year of assembly for recall purposes. Tr. at 51-53 (Douglas testimony).

15. Following the pull test, the pacifier moves down a conveyor belt and is pad printed. Pl.'s Ex. 5; Tr. at 44 (Douglas testimony). The pad printer places a decorative design on the knob. Pl.'s Ex. 5; Tr. at 45 (Douglas testimony).

16. After the pad printing occurs, the pacifier is picked up by a mechanical arm that moves the pacifier down the assembly line. Pl.'s Ex. 5; Tr. at 46 (Douglas testimony).

17. Only the MAM ULTI MAM pacifiers were packaged in Hungary, the MAM MINI ULTI pacifiers were shipped in bulk to Sassy. Tr. at 121-23 (Douglas testimony).

18. The pacifier next moves to a packaging station where a worker places two pacifiers and a pamphlet, written in English explaining the pacifier's functions and containing Sassy's name, into a plastic box suitable for retail display. Pl.'s Ex. 5; Tr. at 47-48 (Douglas testimony).

19. A worker seals the plastic container using an automated tape machine. The tape is printed in English and contains warnings and Sassy's name. Pl.'s Ex. 5; Tr. at 48-49 (Douglas testimony).

20. A label, in English, is also placed on the box, which lists the appropriate age ranges for the product, its recommended uses and Sassy's name. Pl.'s Ex. 5; Tr. at 50 (Douglas testimony).

21. The plastic boxes are then placed in master cartons that are shrink wrapped and placed on skids

for shipment. Pl.'s Ex. 5; Tr. at 54 (Douglas testimony).

22. A destination statement is placed on the skid, which for Sassy's pacifiers would indicate the United States. The skids are then loaded onto trucks to be taken to the docks. Pl.'s Ex. 5; Tr. at 54-55 (Douglas testimony).

23. The shipping bill for the entry at issue lists the shipment origin as Hungary and the destination as the United States. Pl.'s Ex. 10B; Tr. at 84 (Douglas testimony). The bill of lading, which is contained in the entry papers, lists the place of receipt as Austria, the place of loading as Zeebruge, the port of discharge as Montreal, and the place of delivery as Michigan. Tr. at 194 (Douglas testimony). A certificate of origin form issued in the Hungarian Republic, contained in the entry papers, lists the origin of the pacifiers as Austria and the consignees in the United States. Tr. at 204 (Douglas testimony).

24. The court finds that the pacifiers at issue entered the customs territory of the United States without entering the commerce of any other country.

25. The court finds that Plaintiff's Exhibit 4A, listing the costs of producing the pacifier, is not credible evidence of the costs incurred in manufacturing the pacifiers at issue.

26. The cost presentation was prepared specifically for the instant litigation by MAM for Sassy. Tr. at 155 (Douglas testimony). No one from Sassy examined the books and records from which the cost presentation was produced. Tr. at 149, 153, 217-18, 221. (Douglas testimony). Sassy's witness also stated that he did not know whether the cost sheet, which included building amortization and machinery amortization, was prepared in accordance with Generally Accepted Accounting Principles. Tr. at 154, 182, 184, 186-92 (Douglas testimony). Sassy's witness was

also unfamiliar with the cost of the individual components. Tr. at 169 (Douglas testimony). Finally, the cost sheet for the MAM MINI ULTI, which was shipped in bulk in 1993, but not at present, includes packaging costs, raising further questions about the accuracy of the cost presentation. Pl.'s Ex. 4A.

27.     MAM currently employs 200 workers, has moved into a new manufacturing facility in Hungary and acquired new equipment. Tr. at 113, 156 (Douglas testimony). In addition to pacifiers, MAM manufactures a leash, drinking cups and bottles and the production has increased due to automation. Tr. at 103, 156 (Douglas testimony).

28.     If any of these findings of fact shall more properly be conclusions of law, they shall be deemed to be so.

### III.  CONCLUSIONS OF LAW

29.     The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(a).[1]

---

[1]  Two peripheral matters must be dealt with before proceeding further. First, at the end of the trial the court ordered that post-trial briefs were to be filed within 90 days. The latest date for filing briefs was July 26, 2000. The court further notified the parties that post-trial briefs were due no later than 4 p.m. on that date. Customs complied and Sassy did not. Since the filing of post-trial briefs is an entitlement and not a right, the court deems Sassy to have waived its privilege by failing to file a brief within the time limits established. Second, Customs for the first time in its post-trial brief raises an argument that Customs Form A, stating Country of Origin, was improperly completed, thus constituting a separate ground entitling Customs to judgment in its favor. The court has not considered this argument because it was not one that could only be discovered in the course of trial. Indeed, the Form A was part of the entry papers. Thus, since Customs failed to raise the argument prior to trial, the court considers it waived.

30. The statute that governs this action, provides in relevant part, that:

> (1) [D]uty-free treatment . . . shall apply to any eligible article which is the growth, product or manufacture of a beneficiary developing country, if –
>
> (A) that article is imported directly from a beneficiary developing country into the customs territory of the United States; and
>
> (B) the sum of the (i) cost or value of the materials produced in the beneficiary developing country . . . plus (ii) the direct costs of processing operations performed in such beneficiary developing country . . . is not less than 35 percent of the appraised value of such article at the time of its entry into the customs territory of the United States.
>
> (2) The Secretary of the Treasury . . . shall prescribe such regulations as may be necessary to carry out this subsection, including, but not limited to, regulations providing that, in order to be eligible for duty-free treatment under this subchapter, an article must be wholly the growth, product, or manufacture of a beneficiary developing country, or must be a new or different article of commerce which has been grown, produced, or manufactured in the beneficiary developing country; but no article or material of a beneficiary developing country shall be eligible for such treatment by virtue of having merely undergone –
>
> (A) simple combining or packaging operations . . . .

19 U.S.C. § 2463(b) (Supp. V. 1993).

31. In order to qualify as the growth, product or manufacture of a beneficiary developing country, a substantial transformation must occur. *See SDI Technologies, Inc. v. United States*, 977 F. Supp. 1235 (CIT), *aff'd per curiam*, 155 F.3d 568 (Fed. Cir. 1998). A "[s]ubstantial transformation occurs when an article emerges from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process." *Torrington, Co. v. United States*, 764 F.2d 1563, 1568 (Fed. Cir. 1985) (citing *Texas Instruments, Inc. v. United States*, 681 F.2d 778, 782 (C.C.P.A. 1982)). The importance of

each characteristic is determined in each case, with a change in name generally being the weakest indicator of a substantial transformation. *See SDI Technologies, Inc. v. United States*, 977 F. Supp. 1235, 1239 & n.3 (CIT 1997). Finally, while the phrase "substantial transformation" exists in a number of different provisions within the Customs laws, in GSP cases, the fundamental purpose of promoting industrialization in lesser developed countries is of considerable importance. *See Torrington Co.*, 764 F.2d at 1569. Therefore, the country of origin may differ from the country where a substantial transformation occurs for GSP purposes. *See Madison Galleries, Ltd. v. United States*, 870 F.2d 627, 633 (Fed. Cir. 1989); *see also* S. REP. NO. 101-252, at 43 (1990), *reprinted in* 1990 U.S.C.C.A.N. 928, 971 (changing statute to require a substantial transformation, but not disturbing court's reasoning that a product may be considered from one country for marking purposes and from another for GSP eligibility).

32.    The court concludes as a matter of law that a substantial transformation of the four component parts occurs in Hungary. Further, the court concludes as a matter of law that the article emerging has a different name, character and use than the original material. All of the witnesses who testified named each of the component parts as nipples, teats or baglets, a shield, a knob, and a retaining plug. The witnesses likewise all testified that the finished article was a pacifier. Thus, a change in name clearly occurs. A change in character also occurs. Character is "'one of the essentials of structure, form, materials, or function that together make up and usu[ally] distinguish the individual.'" *National Hand Tool Corp. v. United States*, 16 CIT 308, 311, *aff'd*, 989 F.2d 1201 (Fed. Cir. 1993) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981)). While the component parts are readily identified in the pacifier, the function of the finished good

is different from the component parts. *See, e.g., SDI Technologies, Inc.*, 977 F. Supp. at 1240 (noting that a shift from producer goods to consumer goods may have some evidentiary value). Further, once welding occurs, the component parts cannot be disassembled without destroying the finished good. Finally, a change in the use of the materials occurs. Before the component materials are assembled in Hungary, each piece is without any use beyond manufacture into a pacifier. Once the operations are completed in Hungary, the pacifier may be used by infants for its intended purpose.

33. The statute also notes that a substantial transformation may not be effected by means of simple combining or packaging operations. *See* 19 U.S.C. § 2463(b)(2)(A). Customs has implemented regulations defining the phrase "simple combining or packaging operations" as "[f]itting together a small number of components by bolting, glueing soldering, etc." 19 CFR § 10.195(a)(2)(i)(B) (1993). The reason for this requirement is to promote the purpose of the GSP program, which is "to extend preferential tariff treatment to the exports of less-developed countries to encourage economic diversification and export development within the developing world." S. Rep. No. 93-1298, at 5, *reprinted in* 1974 U.S.C.C.A.N. 7186, 7187. The court concludes, as a matter of law, that the operations in Hungary are not simple combining operations. Based on its findings of fact, the court is satisfied that the operations in Hungary promote the purposes of the GSP program. There are a number of steps involved in the production of the merchandise beyond the assembly of the pacifier, including pad printing, laser coding and packaging. In addition, to maintain and run the equipment, MAM has tool shops on site in Hungary. Finally, the facts indicate that the operation in Hungary has expanded to include additional lines of merchandise, increased

automation and production and the purchase of a new manufacturing facility and equipment. These all indicate that the purpose of the GSP program was being facilitated by the operations in Hungary.

34. As noted above, the statute requires that merchandise from a beneficiary developing country must be imported directly to qualify for duty free treatment. Customs has issued regulations defining the phrase "imported directly." The regulation states, in relevant part, that merchandise is imported directly:

> [i]f the shipment is from a beneficiary developing country to the U.S. through the territory of any other country, the merchandise in the shipment does not enter into the commerce of any other country while en route to the U.S., and the invoice, bills of lading, and other shipping documents show the U.S. as the final destination . . . .

19 CFR § 10.175(b) (1993).

Based on its findings of fact, above, the court concludes as a matter of law that the subject merchandise meets the definition of imported directly.

35. Finally, the statute requires that 35% of the appraised value of the merchandise when it enters the United States come from either (or both) the value of materials produced in the beneficiary developing country and/or the direct costs of processing operations performed in the beneficiary developing country. *See* 19 U.S.C. § 2463(b)(1)(B). Based upon its findings of fact regarding Sassy's cost information, the court concludes Sassy has failed to prove that the Hungarian operations add 35% or more of the pacifiers' appraised value.

36.     If any of these conclusions of law shall more properly be findings of fact, they shall be deemed to

be so.

Dated: _____                              _____

New York, NY                                             Judith M. Barzilay
                                                         Judge

## ERRATUM

*Sassy, Inc. v. United States of America*, Court No. 95-07-00882, Slip Op. 00-93, dated August 2, 2000.

On p. 6, footnote 1, lines 4 through 6, the sentence "Since the filing of post-trial briefs is an entitlement and not a right, the court deems Sassy to have waived its privilege by failing to file a brief within the time limits established," should be omitted, and replaced with "Counsel for Sassy claims that it did not receive the court's notice."

August 22, 2000