**Slip Op. 00-118**

## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

--------------------------------------------------    **x**

BOLTEX MANUFACTURING CO., **:**
L.P., *et. al.,*

                 **:**

       Plaintiffs,                    Court No. 00-07-00314

                 **:**

       v.

                 **:**

UNITED STATES OF AMERICA,

                 **:**

       Defendant,

                 **:**

       and

                 **:**

UNITED STATES FLANGES AND
FITTINGS MARKING COALITION,      **:**

       Defendant-Intervenor.

-------------------------------------------------------    **x**

[Plaintiffs' Motion for Judgment on the Agency Record granted.]

                                        Decided: September 8, 2000.

*Mayer, Brown & Platt* (*Simeon M. Kriesberg*), *Kathryn Schaefer, Andrew A. Nicely*, for Plaintiffs.

*David W. Ogden*, Assistant Attorney General; *Joseph I. Liebman*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, Department of Justice (*Barbara M. Epstein*); *Paula Smith*, Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of counsel, for Defendant.

*McKenna & Cuneo, LLP* (*Peter Buck Feller*), *Daniel G. Jarcho*, *Vincent M. Routhier*, *Myron Paul Barlow*, for Defendant-Intervenor.

**BARZILAY, JUDGE:**

### I. INTRODUCTION

      This case is before the court pursuant to USCIT R. 56.1(c) providing for judgment on an agency

record. Plaintiffs (hereinafter "Plaintiffs" or "Boltex") are importers of carbon and stainless steel forgings.[1]

After importation, Boltex subjects the forgings to certain processes in the United States and sells them as

pipe fittings and flanges.[2]

Boltex challenges the determination of the United States Customs Service ("Customs") announced

in Treasury Decision ("T.D.") 00-15, *Final Interpretation: Application of Producers' Good Versus*

*Consumers' Good Test in Determining Country of Origin Marking,* 65 *Fed. Reg.* 13827 (March 14,

2000) ("*Final Interpretation*"). The *Final Interpretation* announces that Customs will no longer be

bound by a particular test in determining country of origin and, as a result, pipe fittings and flanges made

in the United States with imported forgings must be marked with the country of origin of the forgings. *See*

*id.* at 13831. Boltex claims that this final determination unlawfully changes 30 years of industry practice

to its detriment. It asks this court to vacate Customs' decision and, in the alternative, to enjoin Customs

from enforcing the decision pending judicial review on the merits if the court is unable to render a decision

before September 11, 2000, the effective date of the *Final Interpretation.* The court exercises

jurisdiction pursuant to 28 U.S.C. § 1581(h)(1994).[3]

---

[1] Forgings are rough steel forms that have been created from a pipe, billet or bar. *See Pls.' Mem. of P. & A. in Supp. of Pls.' Mots. for J. on the Agency R. and for a Prelim. Inj.* ("*Pls.' Br.*") at 5.

[2] Fittings and flanges are made of steel and used to connect pipe sections and components in a variety of applications. *Pls.' Br.* at 5.

[3] 28 U.S.C. § 1581(h) provides:

The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury, or a refusal to issue or change such a ruling, relating to

## II. BACKGROUND

Federal law requires that every article of foreign origin that is imported into the United States be marked with its country of origin in such a manner that its ultimate purchaser will be aware of its country of origin. *See* 19 U.S.C. § 1304(a)(1994). An ultimate purchaser is defined in Customs regulations as generally "the last person in the United States who will receive the article in the form in which it was imported. . . ." 19 C.F.R. § 134.1(d) (1999). When a foreign article is subjected to manufacturing in the United States before reaching the consumer, the regulations provide some guidance as to when the manufacturer will be regarded as the ultimate purchaser. A manufacturer will be considered the ultimate purchaser "if he subjects the imported article to a process which results in a substantial transformation of the article, even though the process may not result in a new or different article. . . ." 19 C.F.R. § 134.1(d)(1).[4] On the other hand, if the manufacturing process is "merely a minor one which leaves the identity of the imported article intact," the consumer is regarded as the ultimate purchaser. 19 C.F.R. § 134.1(d)(2). In the former case the product is not subject to the country of origin marking statutes; in the latter the country of origin must appear on the product.

---

classification, valuation, rate of duty, marking, restricted merchandise, entry requirements, drawbacks, vessel repairs, or similar matters, but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation.

Although Defendant does not challenge jurisdiction under this provision, the court has reviewed Plaintiffs' affidavits and finds that they have made the requisite showing of irreparable harm.

[4] *But see* 19 C.F.R. §134.35(a)(1999) (stating,"the manufacturer . . . who converts or combines the imported article into the different article will be considered the 'ultimate purchaser' . . . .").

Our court and its predecessors have struggled valiantly to determine what processing will result in a substantial transformation. Many tests have been articulated and applied, depending on the product and processes at issue.[5] In 1970 the Customs Court decided *Midwood Industries v. United States*, 64 Cust. Ct. 499, 313 F. Supp. 951 (1970), *appeal dismissed*, 57 C.C.P.A. 141 (1970). In *Midwood*, an importer of steel forgings protested Customs' decision to exclude its merchandise because it was not properly marked. *See id.*, 64 Cust. Ct. at 500, 313 F. Supp. at 952. Customs claimed that the existing markings were obliterated by the finishing process and the forgings had to be marked so that the marking would appear after the processing was complete. *See id.*, 64 Cust. Ct. at 502, 313 F. Supp. at 953. The importer claimed that the ultimate purchaser of the forgings was the processor in the United States that converted them to pipe fittings and flanges. *See id.*, 64 Cust. Ct. at 500-501, 313 F. Supp. at 952. The court agreed, holding that the forgings were substantially transformed after importation into pipe fittings and flanges and, therefore, the importer's marking was proper. *See id.*, 64 Cust. Ct. at 507-508, 313 F. Supp. at 957.

Following the *Midwood* decision, Customs issued several ruling letters to importers of forgings confirming that the United States manufacturers of the end products, the pipe fittings and flanges, were indeed the ultimate purchasers for purposes of the marking statute.[6] These rulings were important as the

---

[5] The country of origin determination and thus, substantial transformation, is also at issue in questions such as eligibility for duty preferences, drawback and others. *See, e.g., Koru North America v. United States*, 12 CIT 1120, 1126, 701 F. Supp. 229, 234 n.9 (1988); *Nat'l Juice Prod. Ass'n v. United States*, 10 CIT 48, 58, 628 F. Supp. 978, 988 n. 14 (1986).

[6] *See, e.g.*, Headquarters Ruling Letters ("HRL") 559871 (February 18, 1997), 734673 (December 17, 1992), 732883 (August 1, 1990), 730416 (May 11, 1987), and 700022 (October 27, 1972).

processes performed in the United States usually obliterate the die-stamped marking which appears on the forging in its imported condition.[7]

In 1993 Congress passed the *North American Free Trade Agreement* ("NAFTA") *Implementation Act,* Pub. L. No. 103-182, § 207, 107 Stat. 2057 (1992), (codified as amended at 19 U.S.C. §3304 (1996)), which included special rules for determining whether an article would be considered a product of one of the signatory countries and thus eligible for whatever preferential treatment the agreement afforded that product. The NAFTA country of origin rules are voluminous and complex. *See* 19 U.S.C. § 3332 (1996). Briefly, as relevant here, they generally provide that evidence of substantial transformation will be determined by a change in the Harmonized Tariff classification, a "tariff shift." That is, the process performed on the product must result in a change in the Harmonized Tariff Schedule of the United States ("HTS" or "HTSUS") classification for that product to be considered substantially transformed. These tariff shift rules are product specific and were negotiated by the parties and codified by statute. *See* 19 U.S.C. § 3332(a)(1)(B)(I).

The NAFTA marking rules were promulgated by T.D. 95-69, 60 *Fed. Reg.* 46188 (1995), *as amended by* T.D. 96-56, 61 *Fed. Reg.* 37817 (1996), and appear in 19 C.F.R. § 102.20 (1996). Under the rules, forgings, pipe fittings and flanges are all classified under HTS heading 7307, covering "[t]ube or pipe fittings . . . of iron or steel." Therefore, for marking purposes, a substantial transformation does not occur in the finishing process, and the pipe fittings and flanges must be marked with the country of origin

---

[7] In 1984 Congress amended the marking statute to require that certain pipe and fittings be marked by means of die-stamping or similar processes. *See* 19 U.S.C. § 1304(c).

of the forgings themselves.  This development created an anomaly for the steel pipe fitting industry.  Pipe

fittings and flanges made from Mexican or Canadian forgings had to be marked, while pipe fittings and

flanges made from forgings imported from any other country did not.

In April 1996,  Maass Flange Corporation ("Maass") wrote to Customs complaining that the

"country of origin marking regulations are not uniform as to imported goods from NAFTA and non-

NAFTA countries." *Administrative Record* ("*AR*") at 0164.  While recognizing that the NAFTA marking

rules "do not technically apply to non-NAFTA origin goods," Maass requested that they be so applied.

*See AR* at 0167, 0170.  On May 14, 1996 Customs responded, suggesting that Maass file a petition

pursuant to 19 U.S.C. § 1516(a)(1984), as Customs could not grant the relief requested.[8]

On February 18, 1997, Customs issued HRL 559871 in response to a ruling request from an

importer of steel forgings from Mexico, Germany and Italy. *See AR* at 0174.  In the ruling letter, Customs

explained that the NAFTA marking rules applied to the forgings from Mexico, but not to those imported

---

[8]19 U.S.C. § 1516, *Petitions by domestic interested parties*, provides:

(a)     Request for classification and rate of duty; petition

(1)     The Secretary shall, upon written request by an interested party furnish the
classification and the rate of duty imposed upon designated imported merchandise
of a class or kind manufactured, produced, or sold at wholesale by such interested
party.  If the interested party believes that the appraised value, the classification,
or rate of duty is not correct, it may file a petition with the Secretary setting forth-

(A)     a description of the merchandise,
(B)     the appraised value, the classification, or the rate of duty that it believes
proper, and
(C)     the reasons for its belief.

from Germany and Italy. It stated:

> [A]fter notice and comment in the Federal Register, the NAFTA Marking Rules set forth at 19 CFR Part 102 were not adopted for all trade, and the *Midwood* decision, while questioned in subsequent court decisions, has not been overruled. Accordingly, to the extent that forgings are not imported from a NAFTA Party, the NAFTA Marking Rules will not apply. In the absence of other information that the flanges being imported from non-NAFTA countries are undergoing operations that are different from the processes performed in *Midwood*, the *Midwood* case still will be applicable for determining the country of origin marking requirements. Therefore, steel flanges processed from forgings of Italian or German origin, as described above, will not require any country of origin marking for Customs purposes.

*AR* at 0178.

In May 1997, Customs met with Maass representatives and assured them that Customs "will be publishing a notice that will have the effect of reconciling [*Midwood*], as applied by Customs, and the NAFTA marking rules of origin." *AR* at 0122. Shortly after the Maass meeting several officials of the Department of the Treasury and Customs met to discuss "whether it is necessary to follow *Midwood* outside the context of the NAFTA Marking Rules. . . ." *AR* at 0180. It was agreed that "the *Midwood* decision would not need to be applied if proper notice and comment procedures were again followed." *Id.* Recognizing that such a procedure would evoke controversy one official "questioned whether the notice in the *Federal Register* could be named something other than a notice of 'change in practice' or 'change in position.'" *Id*.

Accordingly, on March 26, 1998, Customs published a *Notice of Proposed Interpretation; Solicitation of Comments: Application of Producers' Good Versus Consumers' Good Test in Determining Country of Marking*, 63 *Fed. Reg*. 14751 (1998)("*Proposed Interpretation*"), advising the public that it "does not intend to rely on the distinction between producers' goods and consumers'

goods in making country of origin marking determinations" and soliciting comments. Although the notice

discussed the *Midwood* case in detail and analyzed other substantial transformation cases, it did not cite

19 U.S.C. § 1625(d) (1993) nor did it suggest any action that would result from its intention not to rely on

the producers' goods-consumers' goods distinction.[9]  Customs did explain:

> In *Midwood Industries, Inc. v. United States*, 313 F. Supp. 951 (Cust. Ct. 1970), the
> U.S. Customs Court considered whether an importer of steel forgings was the ultimate
> purchaser for purposes of the marking statute, 19 U.S.C. 1304.  The court cited the
> principles set forth in *United States v. Gibson-Thomsen Co., Inc.*, 27 CCPA 267
> (1940), in determining that the importer's manufacturing operations made it the ultimate
> purchaser, namely that the importer may be considered the ultimate purchaser for marking
> purposes if it subjects the article to further processing that results in the manufacture of a
> new article with a new name, character and use.  However, the *Midwood* court also found
> it relevant to that finding that the imported forgings at issue were transformed from
> producers' goods to consumers' goods, stating:

>> While it may be true . . . that the imported forgings are made as close to
>> the dimensions of ultimate finished form as is possible, they, nevertheless,
>> remain forgings unless and until converted by some manufacturer into
>> consumers' good, i.e., flanges and fittings.  And as producers goods the
>> forgings are a material of further manufacture, having, as such, a special
>> value and appeal only for manufacturers of flanges and fittings.  But, as
>> consumers' goods and flanges and fittings produced from these forgings
>> are end use products, having, as such, a special value and appeal for
>> industrial users and for distributors of industrial products.  *Midwood* at
>> 957.

It is Customs' opinion that based on subsequent court decisions applying substantial

---

[9] 19 U.S.C. § 1625(d) provides:

Publication of Customs decisions that limit court decisions:

A decision that proposes to limit the application of a court decision shall be published in the
Customs Bulletin together with notice of opportunity for public comment thereon prior to a final
decision.

transformation analysis, *Midwood* would be decided differently today.

63 *Fed. Reg*. at 14751. The *Proposed Interpretation* ends by stating, "[i]f this proposal is adopted, parties may seek clarification regarding the continued viability of any ruling that they believe was based on the producers' goods- consumers' goods analysis articulated in *Midwood*." *Id.*

On March 14, 2000, Customs published the *Final Interpretation*. On the next to last page of the *Final Interpretation*, in response to a comment, Customs states:

> The change in treatment proposed by Customs will place all importers of pipe fittings and flanges on an equal footing . . . . Because the current country of origin marking requirement for pipe fittings and flanges is based on administrative treatment, rather than a specific ruling, Customs will require that all pipe fittings and flanges produced in the United States from imported forgings be marked with the country of origin of the imported forging.

65 *Fed. Reg*. at 13830. Apparently, this was the first public discussion by Customs that a change in marking would be required. The *Final Interpretation* continues: "Customs has provided notice in the Customs Bulletin (and Federal Register) as required by 19 U.S.C. 1625(d) of its intention not to rely on the producers' to consumers' good test." 65 *Fed. Reg*. at 13831. Boltex filed its complaint in this action on July 11, 2000.

In its motion for judgment, filed August 11, 2000, Boltex alleges that 1) Customs exceeded its statutory authority when it effectively overruled the Custom Court's decision in *Midwood*; 2) Customs denied Plaintiffs' due process rights by failing to give adequate notice and comment opportunity; 3) Customs unlawfully failed to articulate a "compelling reason" for its decision to disregard *Midwood*; 4) the Final Interpretation is arbitrary and capricious as a matter of law because Customs targets fittings and flanges manufacturers and because it requires that fittings and flanges made from non-NAFTA-origin

forgings be marked in accordance with the NAFTA marking rules; 5) Customs wrongly concluded that *Midwood* is no longer good law; and 6) Customs abused its discretion in setting the effective date so that the fitting and flange industry is required to comply with new marking rules within months.

Customs counters that 1) its determination as announced in the *Final Interpretation* to limit the *Midwood* decision was expressly authorized by statute, 19 U.S.C. § 1625(d), and regulation, 19 C.F.R. § 177(d)(1998); 2) it provided notice and a meaningful opportunity to comment on its limitation of "the *Midwood* criterion"; 3) it need not articulate a compelling reason for its determination; 4) it did not unlawfully discriminate against the fittings and flanges industry and did not improperly apply NAFTA rules to imports from non-NAFTA countries; and 5) it did not abuse its discretion in setting the effective date for its new marking requirements.

### III. STANDARD OF REVIEW

28 U.S.C. § 2640 (1994) defines the scope and standard of review for the Court of International Trade. Section 2640(e) provides, "[i]n any civil action not specified in this section, the [court] shall review the matter as provided in [5 U.S.C. § 706]." Plaintiffs claim, and Defendant does not dispute, that this action is properly brought within the court's jurisdiction under 28 U.S.C. § 1581(h) (1994). *See Pl.'s Br.* at 16; *Def.'s Br.* at 14. As section 2640 does not specify the standard of review for civil actions filed under 28 U.S.C. §1581(h), the court reviews Plaintiffs' motion under 5 U.S.C. §706 (1994). The court must "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). The scope of review is limited to the administrative record. *See* 28 U.S.C. § 2640(e); 5 U.S.C. § 706;

USCIT R. 56.1.

Plaintiffs acknowledge that the appropriate standard of review in this case is the arbitrary and capricious standard, but argue that the court should accord no deference to Customs's actions. *See Pls.' Br.* at 26. Boltex further asserts that because the *Final Interpretation* consists solely of legal analyses and conclusions, the court should exercise *de novo* review. *See id.* at 26, 27. The court agrees with Defendant that *de novo* review is not applicable when a court reviews the actions of an administrative agency on the record made before the agency. *See Def.'s Br.* at 21. The court notes, however, that the Administrative Procedures Act ("APA"), provides that in reviewing agency actions, the court "shall decide all relevant questions of law, [and] interpret constitutional and statutory provisions. . . ." 5 U.S.C. 706.[10] It is well-settled that the arbitrary and capricious standard of review is not merely deferential to agency action, but the *most* deferential of the APA standards of review. *See* In re *Gartside*, 203 F. 3d 1305, 1312 (Fed. Cir. 2000) ("Because this [arbitrary and capricious] standard is generally considered to be the most deferential of the APA standards of review, . . . the reviewing court analyzes only whether a rational connection exists between the agency's factfindings and its ultimate action")(citations omitted). The court must uphold the agency's actions unless Customs' conclusion was plainly unreasonable or irrational.

---

[10]This appears to be a codification of the bedrock constitutional principle first enunciated in *Marbury v. Madison*, 5 U. S. ( 1 Cranch) 137 (1803).

## IV. DISCUSSION

### A. Customs has the authority to limit a decision of this court.

Because of the mechanics of the importing process and the fact that each import entry is considered a separate cause of action, Customs has always enjoyed the discretion not to apply a decision of this court to later-imported entries, even of the same merchandise. *See* 19 U.S.C. § 1514(c) (1994) (providing for filing of a protest for each entry); *J.E. Bernard & Co., Inc. v. United States*, 66 Cust. Ct. 545, 550, 342 F. Supp. 496, 503 n. 9 (1971) (noting that each importation is a separate cause of action). Reasons for this authority, as well as an outline of the nature and history of judicial review of Customs' decisions are found in *United States v. Stone & Downer Co.*, 274 U.S. 225 (1927). This authority is codified at 19 C.F.R. § 177.10(d)(1998), which provides:

> (d) Limiting rulings. A published ruling may limit the application of a court decision to the specific article under litigation, or to an article of a specific class or kind of such merchandise, or to the particular circumstances or entries which were the subject of the litigation.

In 1993, as part of the *Customs Modernization Act* ("*Mod Act*"), Congress added 19 U.S.C. § 1625(d) as follows: "A decision that proposes to limit the application of a court decision shall be published in the Customs Bulletin together with notice of opportunity for public comment thereon prior to a final decision." In its brief, Defendant asserts that "[s]ection 1625(d), in essence, codified Customs regulation, 19 C.F.R. §177.10(d)." *Def.'s Br.* at 33. While it is true that § 1625(d) speaks to Customs' authority to limit a court decision, the statute does not simply codify the regulation. Rather, it places an important condition upon Customs' actions. Whereas before the statute's enactment, Customs could

exercise that authority without providing an opportunity for notice and comment; in passing §1625(d), Congress intended to, and did, impose a notice and comment requirement whenever Customs chose to limit a court decision.

The legislative history of § 1625(d) explains that the purpose of the statute is to "provide assurances of transparency concerning Customs rulings and policy directives through publication in the Customs Bulletin or other easily accessible source." H.R. REP. NO. 103-361 at 124 (1993), reprinted in 1993 U.S.C.C.A.N. 2552, 2674. The requirement of publishing and soliciting comments on a decision to limit a judicial holding also acts to alert any importers that could be adversely affected by the limitation to challenge the limitation administratively, and if unsuccessful, to seek prompt review in this court pursuant to 28 U.S.C. § 1581(h).[11] It therefore embodies within the statute an early warning system for aggrieved importers, and notifies the agency that it may be required to defend its decisions before this court. As discussed, the court will affirm any contested limitation decision if it finds a rational connection between the agency's factfinding and its ultimate action. *See* In re *Gartside*, 203 F.3d at 1312.

After briefing was completed and before oral argument, Plaintiffs brought to the court's attention T.D. 78-481, *Notice that Final Court Decisions Adverse to the Customs Service will be Given General Effect Unless a Limited Ruling is Published Within 180 Days: Modification and Clarification of* T.D. 78-302, ("*Modification*"), 43 *Fed. Reg.* 57208 (1978). In the *Modification*, Customs states that it will announce its intention to limit adverse holdings of this court within six months of

---

[11] 28 U.S.C. § 1581(h) is a limited waiver of sovereign immunity and provides for judicial review of a ruling prior to the importation of the goods involved, upon a showing of irreparable harm.

the court's decision. *See id.* at 57208. It further explains the procedures to be followed with regard to liquidation and reliquidation of entries when Customs acquiesces in an adverse holding and "in those relatively rare and unusual circumstances" when it does not. 43 *Fed. Reg.* at 57209. Plaintiffs then argue that even were Customs "limiting" *Midwood*, the agency cannot do so in contravention of this notice, thirty years after the court decision. At oral argument, Defendant presented several reasons why T.D. 78-481 is not controlling, the most important being that the time limit announced was never codified in statute or regulation, and therefore has no precedential effect. *See* T.D. 78-414, 12 *Cust. B. & Dec.* 920 (1978) (providing that a T.D. designation will be used when publication is necessary, but does not constitute legal precedent).

The *Modification* is instructive, however, because it sheds light on reasons why Customs may want to limit an adverse court holding. For instance, Customs states that a holding may be limited "until the legal principle or issue involved could be reconsidered by the courts on the basis of a more complete presentation of evidence." 43 *Fed. Reg.* at 57209. Customs further describes these situations as:

> those relatively rare and unusual circumstances in which a determination to limit an adverse decision is made, usually in cases in which the Customs Service believes that the specific evidence available for judicial evaluation has not provided to the courts an adequate basis for establishing a universally applicable rule of law . . . .

*Id.* Customs may limit a court decision; the court now analyzes Customs' action in this case to discern whether it can be sustained as rational.

**B.      Customs' action was an abuse of its discretion.**

In the *Final Interpretation*, Customs changed the marking requirements for imported forgings based on its own determination that *Midwood* is no longer good law.  Customs thereby abused its discretion in two ways.  First, Customs encroached upon judicial authority by attempting to overrule a viable judicial decision.  Second, Customs abused its discretion by relying on a legal conclusion that the producers' goods-consumers' goods distinction is no longer good law, rather than engaging in and providing a reasoned factual analysis, or in the words of the *Modification*, "a more complete presentation of the evidence," in determining that the forgings would no longer be considered substantially transformed. 43 *Fed. Reg.* at 57209.

1)      *Customs has overstepped its authority by overruling* Midwood.

a.      <u>*Midwood* is a continuing judicial decision that has not been overruled by this court or a superior court.</u>

Customs attempts to defend its actions by arguing that *Midwood* is no longer good law.  The court has carefully analyzed our predecessor court's opinion in *Midwood* and cannot agree with Customs.  Much of the *Midwood* opinion discusses the various processes involved in converting forgings into fittings and flanges.  The testimony quoted in the opinion centers on the use of the imported articles.  *See* 64 Cust. Ct. at 506, 313 F. Supp. at 956.  The court also refers to testimony regarding nomenclature.  *See id.*  The court then discusses and quotes from *Gibson-Thomsen* the essential language concerning "a new article having a new name, character and use."  27 C.C.P.A. at 271.  The opinion clearly states,

[W]e are also of the opinion that the end result of the manufacturing processes to which the imported articles are subjected in plaintiffs' Tube Line plant is the transformation of

such imported articles into different articles having a new name, character and use.

64 Cust. Ct. at 507, 313 F. Supp. at 957.

The *Midwood* court then proceeds to discuss the forgings as producers' goods until "converted by some manufacturer into consumers' goods." *Id.* But this analysis is by no means the sole basis of the court's holding. The producers' goods-consumers' goods distinction serves as a supplement to the court's analysis and conclusion based on the *Gibson-Thomsen* test of a new name, character and use. This reading of the *Midwood* decision is supported by several subsequent decisions of the Customs Court, the Court of International Trade, and the Court of Appeals for the Federal Circuit.[12]

In support of its statement that *Midwood* would be decided differently today, and that Customs has therefore not acted irrationally, Defendant cites and discusses several judicial opinions wherein "numerous Judges in this Court and the Federal Circuit have also elected **not** to be bound by that particular criterion in making a decision regarding whether imported merchandise was 'substantially transformed' for marking purposes." *Def.'s Br.* at 24. Customs first cites *Nat'l Hand Tool Corp. v. United States*, 16 CIT 308, 312 (1992), 1992 WL 101006, at *4, wherein this court declined to follow *Midwood's*

---

[12]*See, e.g., Torrington Co. v. United States*, 764 F. 2d 1563, 1571 (Fed. Cir. 1985) (citing *Midwood* for its determination that forgings for flanges could enter the United States without country-of-origin markings because the imports were producers' goods while the finished flanges were consumers' goods); *Uniroyal, Inc. v. United States*, 3 CIT 220, 226, 542 F. Supp. 1026, 1031 (1982), aff'd, 702 F.2d 1022 (Fed. Cir. 1983) (distinguishing the facts in *Midwood* from the facts before the court, without overruling the producers' goods-consumers' goods distinction); *Ferrostaal Metals Corp. v. United States*, 11 CIT 470, 477, 664 F. Supp. 535, 541(citing with approval the *Midwood* decision as support for its proposition that "[s]uch a change in the utility of the product is indicative of a substantial transformation"); *Superior Wire v. United States*, 11 CIT 608, 616, 669 F. Supp. 472, 479 (1987) (indicating that *Midwood* has been cited with approval in *Torrington* and held not determinative in *Uniroyal*).

producers' goods-consumers' goods distinction in its analysis of whether a substantial transformation had occurred. *Id.* at 28. In an attempt to support its argument, Customs acknowledges that the court considered the "totality of the evidence," but "clearly did not feel it was compelled to rely upon every factor ever utilized by every court in determining whether the forgings there were 'substantially transformed.'" *Id.* at 29; *Nat'l Hand Tool*, 16 CIT at 311, 1992 WL 101006 at *4. Customs' argument proves too much. While true that in *Nat'l Hand Tool*, the court did not even mention *Midwood*; neither did the court rule that the *Midwood* distinction would hereafter cease to exist. No party to this lawsuit claims that every single factor utilized by every court in determining whether a substantial transformation has occurred must be evaluated in making that determination. What Plaintiffs do aver is that Customs "strayed far beyond its authority when it announced the abrogation of *Midwood*." *Pls.' Br.* at 29.

Defendant then attempts to bolster its argument by analogizing its position to the ruling in *Nat'l Juice Products Assoc. v. United States*, 10 CIT 48,60, 628 F. Supp. 978, 989-90 (1986). *Def.'s Br.* at 29. Defendant correctly notes that in that case, this court held that the Customs ruling at issue, which utilized criteria other than the *Midwood* distinction to determine that a substantial transformation had not occurred, was rational and reasonable. *Id.* at 30. While the *Nat'l Juice* court did hold that "[u]nder recent precedents, the transition from producers' to consumers' goods is not determinative," it did not overrule the *Midwood* decision. 10 CIT at 60, 628 F. Supp. at 990. Rather, the court clarified the meaning of *Midwood*, noting that the "significance of this producers' goods-consumers' goods transformation in marking cases is diminished. . . ." 10 CIT at 60, 628 F. Supp. at 989-90. Nowhere in the *Nat'l Juice* opinion is any statement indicating that *Midwood* is no longer good law.

Customs next asserts that *Uniroyal*, *Inc. v. United States,* 3 CIT 220, 542 F. Supp. 1026 (1982), supports its conclusion that the *Midwood* decision need not be relied upon. *See Def.'s Br.* at 30. While true that the *Uniroyal* court did not find the producers' to consumers' goods distinction to be determinative of whether a substantial transformation had occurred, neither did the court find that the *Midwood* distinction should never again be used in that determination. *Uniroyal*, 3 CIT at 226, 542 F. Supp. at 1031. The court agrees with Plaintiffs that "a fair reading of *Uniroyal* confirms that the court did not reject *Midwood* at all in that 1982 case." *Pls.' Br.* at 46. Judge Maletz in *Uniroyal* determined that under the name, character and use test within which the *Midwood* distinction is one potential consideration, a substantial transformation had not occurred, because "only a minor assembly process takes place. . . ." 3 CIT at 225, 542 F. Supp. at 1030. The opinion went on to clarify that "each case must be decided on its own particular facts." *Id.,* 3 CIT at 224, 542 F. Supp. at 1029 (citations omitted). Thus, Customs is correct that *Uniroyal* stands for the proposition that the court is not required to rely on the producers' goods-consumers' goods distinction in making its substantial transformation determination. However, *Uniroyal* does nothing to support Customs' complete abrogation of the *Midwood* distinction.

Finally, Customs cites *Superior Wire v. United States*, 11 CIT 608, 669 F. Supp. 472 (1987), *aff'd*, 867 F. 2d 1409 (Fed. Cir. 1989), stating that "[a]lthough listed as one of many factors, the producer good/ consumer good distinction was neither explicitly endorsed, nor relied upon by the court in making its determination." *Def.'s Br.* at 31. In that opinion, the court mentioned *Midwood*, but did not state that the distinction should no longer be relied upon in a substantial transformation determination. The court even mentioned in its conclusion that no substantial transformation had occurred, that "[n]o transformation from

producers' to consumers' goods took place. . . ." *Superior Wire,* 11 CIT at 617, 669 F. Supp. at 480. Such a statement indicates that far from being abrogated, the court did consider the *Midwood* distinction in determining whether a substantial transformation had occurred. The court agrees with Boltex that "if this Court intended to question *Midwood*, it could have done so expressly." *Pls.' Br.* at 47.

Customs' attempt to support its action with judicial decisions fails. Taken as a whole, the decisions of this court and the Federal Circuit indicate only that the *Midwood* distinction is one of many indicia of whether a substantial transformation has taken place in marking cases. Customs is correct that *Midwood* need not be relied upon in all instances. However, Customs may not extract from this direction the proposition that *Midwood* is never to be relied upon in determining substantial transformation. Judicial decisions do not indicate that *Midwood* has been or should be overruled; Customs may not take such a task into its own hands.

> b.      Customs has abrogated, rather than limited, the holding of *Midwood*.

Black's Law Dictionary defines the term "limit" as follows: "[t]o abridge, confine, restrain, and restrict. To mark out; to define; to fix the extent of." BLACK'S LAW DICTIONARY 926 (6th ed. 1990). Clearly, the object of the limitation remains in existence following the limitation. In this case, Customs did publish a notice of proposed interpretation, providing an opportunity for public comment before issuing its ruling, although nowhere in that notice does Customs cite its regulatory authority for limiting a court decision, 19 C.F.R. § 177.10(d), nor the statute pursuant to which it now claims it was publishing the notice, 19 U.S.C. § 1625(d). In the *Proposed Interpretation*, Customs states that it "does not intend to rely on the distinction between producers' goods and consumers' goods in making country of origin

marking determinations." 63 *Fed. Reg*. at 14751.[13] After the promulgation of the *Final Interpretation*, Customs issued a decision revoking several HRLs that, based on the *Midwood* analysis, held that certain fittings and flanges manufactured from imported forgings did not have to be marked with the country of origin. *See* 34 *Cust. B. and Decis*. 3 (Aug. 2, 2000).

At the center of Plaintiffs' case is its allegation that Customs has completely abrogated the *Midwood* decision through its promulgation of the *Final Interpretation*. Boltex asserts that the change in marking law resulting from the *Final Interpretation's* conclusion that Customs would hereafter eliminate the producers' goods-consumers' goods distinction from the "substantial transformation" determination, is a proposal to "overrule this Court, and impose a marking requirement in direct contradiction of this Court's holding." *Pls.' Br.* at 4. As discussed earlier, Customs does indeed have the authority to *limit* a court decision; however, the agency may not *entirely ignore* judge-made law. *See supra* Section IV A.[14]

In its defense, Customs asserts that it did not abrogate the *Midwood* decision; rather, the agency limited the effect and application of one of the criteria that was used in the *Midwood* court's analysis of "substantial transformation," with respect to different importations of other importers. *Def.'s Br.* at 33.

---

[13]*Compare Proposed Rule Making: Proposal to Limit the Decision of the Court of International Trade in Nestle Refrigerated Food Co. v. United States*, 1995 WL 664435 (Oct. 17, 1995), wherein Customs declared its intention to limit the decision "to the specific entries which were before the court," citing both the statute and the regulation.

[14] As the regulation so dictates, Customs may limit a judicial decision to (1) a specific article under litigation, (2) an article of a specific class or kind, or (3) to the particular circumstances or entries which were the subject of the litigation. *See* 19 C.F.R. § 177.10(d).

Customs goes on to illustrate that as there is no rule of administrative *stare decisis* it may, within its realm of authority, change its position regarding a 30-year-old Customs case. *Id.* at 37. Finally, Customs refers the court to its analysis in the *Final Interpretation*, stating that "in light of judicial decisions issued after *Midwood*, it believed that the issues presented in *Midwood* would be decided differently today." *Id.*

All of Customs' defenses fail. First, it may well be possible that *Midwood* would be decided differently today. Yet, it is not the prerogative of the United States Customs Service to make such a determination. True, Defendant's *Final Interpretation* does not specifically state that it intended to overrule *Midwood*. Rather, it states, without providing any factual analysis whatsoever, that Customs does not intend to rely on the producers' goods-consumers' goods distinction in determining whether the country of origin of the imported article must be marked on the final product. The *Final Interpretation* concludes:

> Because the current country of origin marking requirement for pipe fittings and flanges is based on administrative treatment, rather than a specific ruling, Customs will require that *all* pipe fittings and flanges produced in the United States from imported forgings be marked with the country of origin of the imported forging. (emphasis added).

65 *Fed. Reg*. at 13830. How Customs has in fact limited the application of *Midwood* with this statement, rather than overruling it, remains a mystery to the court. It apparently was also a mystery to Customs as recently as February 18, 1997, when, in response to a ruling request, it refused to alter the marking rules for forgings imported from non-NAFTA countries by stating, "the *Midwood* decision, while questioned in subsequent court decisions, has not been overruled." HRL 559871, *AR* at 0178.

Plaintiff argues that Customs is prevented from imposing a new marking requirement on United States pipe fittings and flanges in contravention of the *Midwood* holding. *See Pls.' Br*. at 32-33. The court agrees. Plaintiff goes on to argue that "neither the cited statute nor the cited regulation . . . provides

Customs with the authority to disregard a court decision in its entirety." *Id.* at 33. This statement presents a closer case, as it must be reconciled with Customs' authority to limit a court decision. The court's research has discerned no cases addressing the relationship between judicial authority and Customs' ability to limit a court decision.[15] The words of the regulation alone provide little guidance.

Direction may be found in the principle enunciated in *Schott Optical Glass v. United States*, 750 F.2d 62, 64 (Fed. Cir. 1984). In *Schott,* this court held that relitigation was barred by *stare decisis*, a court's refusal to reexamine legal issues previously decided. 7 CIT 36, 39, 587 F. Supp. 69, 71 (1984). The plaintiff, an importer of optical glass, appealed the judgment refusing to allow it to introduce evidence in a second trial demonstrating that the court's prior holding classifying the glass was clearly erroneous. 750 F.3d at 62. The Court of Appeals for the Federal Circuit reversed and remanded, citing the well-recognized exception to the rule of *stare decisis*, that a court will re-examine and overrule a prior decision that is clearly erroneous. The Federal Circuit required the lower court to afford the importer an opportunity to introduce evidence to show that the previous classification was clearly erroneous. *See also J.E. Bernard & Co.*, 66 Cust. Ct. at 550, 324 F. Supp. at 502 n.9, where the court refused to allow relitigation of the appraisement of identical merchandise where "matters decided in the first case have remained static, factually and legally . . . and there have been no intervening changes in the legal climate which would require a different result from that reached in the prior case."

_____

[15]*But see Orlando Food Corp v. United States*, 21 CIT 187, 188 (1997), 1997 WL 108245 at *2, wherein Customs was criticized by the court for using the statute, 19 U.S.C. § 1625(d) "to simply ignore judicial decisions with which it disagrees by providing it with an alternative remedy to appeal. . . . Customs has encroached on the judicial function."(citations omitted).

Here, if Customs believes that the matters decided in *Midwood* have not remained static factually

and legally, and that there have been intervening changes in the legal climate in the past thirty years which

would require a different result, it should be given the opportunity to so demonstrate. It must do so,

however, by giving reasons for its position based on facts and not by usurping a judicial function. If it can

make the requisite showing, and is upheld upon any court review, it can change the marking requirements.[16]

Plaintiffs next argue that Customs specifically targeted fittings and flanges manufacturers, and that

Customs cannot require non-NAFTA forgings to be marked in accordance with NAFTA rules, and

therefore, should be prevented from making the marking change. However, it is not unreasonable for

Customs to attempt to provide uniform marking rules for all imported forgings.[17] No business is guaranteed

an unchanged regulatory climate. So long as procedural safeguards are met, government must be free to

change the rules to accommodate new business realities.[18] The Customs regulations 19 C.F.R. § 177.9

---

[16]Customs endorsed this view in T.D. 78-481, when it announced that in the rare cases where it would limit adverse court decisions, it would do so in order to allow the court to reconsider the issue based on "a more complete presentation of the evidence" in its belief that "the specific evidence available for judicial evaluation has not provided . . . an adequate basis for establishing a universally applicable rule of law." 43 *Fed. Reg*. at 57209.

[17]Customs' attempt to provide uniform marking rules for imported forgings is reasonable, so long as the marking rules are consistent with the requirement that the imported product be marked for the "ultimate purchaser." *See* 19 U.S.C. § 1304(a).

[18]Even though the language of the *Proposed Interpretation* lacked specificity, Plaintiffs received sufficient notice in compliance with the regulatory requirements and general due process concerns. Although the *Proposed Interpretation* did not contain language requiring that the fittings and flanges produced in the United States from imported forgings be marked with the country of origin of the imported forgings, the court cannot agree with Boltex that "Customs did not provide Plaintiffs with *any* notice that it intended to overrule *Midwood's* holding that the manufacture of fittings and flanges substantially transforms imported forgings so as not to require country-of-origin markings on the finished products." *Pls.' Br.* at 36. The comments generated as a result of the *Proposed*

and § 177.10 set out the specific ways in which Customs may respond to new imports and methods of importing by modifying its position on classification, marking, and other issues. In certain circumstances, they require notice and an opportunity to be heard. *See* 19 C.F.R. § 177.10(c)(2). Here, the procedural safeguards were followed, but the change fails because the agency tried to change the rules by usurping a judicial function.

> 2)       *Customs abused its discretion by relying on a legal conclusion, rather than engaging in and providing a reasoned factual analysis, in imposing new marking rules.*

In the *Final Interpretation*, Customs requires "that all pipe fittings and flanges produced in the United States from imported forgings be marked with the country of origin of the imported forging." 65 *Fed. Reg.* at 13830. Central to this requirement is Customs' unspoken finding that such forgings are not substantially transformed by the processing in the United States. Customs states in its *Final Interpretation* that because "the issue presented in *Midwood* would be decided differently today, and because the NAFTA marking rules and *Midwood* decision render different results, it is Customs' position that this action is necessary in order to provide equitable treatment to all importers of pipe fittings and flanges." *Id.* However, the Final Interpretation does not contain any recitation by Customs of the factual analysis required to demonstrate its contention that the forgings are not substantially transformed.[19]

---

*Interpretation* reflect that the industry involved was well aware of the intended result. *See AR* at 0053, 0054, 0055-0057, 0058-0066. One of the Plaintiffs here submitted comments opposing the proposal. *See AR* at 0097-0103.

[19]Customs has accepted that the analysis necessary centers on whether a new article with a new name, character and use has been created. *See* 19 C.F.R. §§ 134.1(d), 134.35(a).

Before Customs can require new markings on finished products made from imported articles, it must explain why it no longer considers the forgings substantially transformed. Customs admits as much when it states at the end of the *Final Interpretation*, "the question of whether a good has been substantially transformed is based on specific facts. . ." and declares its intent to revisit rulings which it states were based on the producers' goods-consumers' goods distinction articulated in *Midwood*. *See* 65 *Fed. Reg*. at 13831. Here, Customs abused its discretion by announcing the marking change first, and postponing the factual analysis under the new name, character and use test. Customs cannot justify its actions merely by declaring that it will not longer rely on the producers' goods-consumers' goods test because "*Midwood* would be decided differently today." *Id.* Even were this statement true, such a determination is for a court and not for the agency.

In its analysis, Customs need not use the producers' goods-consumers' goods distinction in determining that forgings are not substantially transformed in the United States by the processes performed in converting them to pipe fittings and flanges. Every substantial transformation case is product specific and certain tests are more applicable than others to certain products. *See Uniroyal,* 3 CIT at 224, 542 F. Supp. at 1029 (citations omitted) (stating that each case must be decided on its own facts). Customs must, however, explain with reference to the forgings themselves and the processes performed on them, why no new article with a new name, character and use is created.

## V. Conclusion

For the foregoing reasons, the court concludes that Customs' attempt to overrule this court's determination in *Midwood* was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. The court cannot sustain the marking requirement imposed by the *Final Interpretation*. Judgment will enter accordingly.


Dated: _____                    _____
       New York, NY                                  Judith M. Barzilay
                                                  Judge